[Crim. No. 3231. In Bank.—September 14, 1929.]

THE PEOPLE, Respondent, v. MARIO CROCE, Appellant.

J. R. Thomas and Will Van Dyke for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones and Lionel Browne, Deputies Attorney-General, for Respondent.

SEAWELL, J.—Upon the plea of guilty to an indictment charging the defendant with murder, the trial court, upon a hearing conducted for the purpose of fixing the punishment which the defendant should suffer, determined that he was guilty of murder in the first degree and adjudged that as the penalty therefor he should suffer death. (Sec. 190, Pen. Code.)

Three grounds of appeal are presented: First, that the judgment is not sustained by the evidence; second, that the finding that the defendant was guilty of murder in the first degree is not sustained by the evidence; third, that the court erred in denying defendant's motion for a suspension of judgment and refusing his request for a trial by jury for the purpose of determining, as provided by sections 1367, 1368 of the Penal Code, the question as to the defendant's sanity at the time of trial. Said sections read as follows:

"1367. A person cannot be tried, adjudged to punishment, or punished for a public offense, while he is insane.

"1368. If at any time during the pendency of an action up to and including the time when defendant is brought up for judgment on conviction a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be submitted to a jury; and the trial or the pronouncing of the judgment must be suspended until the question is determined by their verdict, and the trial jury may be discharged or retained, according to the discretion of the court, during the pendency of the issue of insanity."

The specific act charged against the defendant was the taking of his wife's life at Elk, more commonly known as Greenwood, situate in the county of Mendocino, this state, on the twenty-sixth day of December, 1928. Both the defendant and his wife had arrived at middle life and

were natives of Italy, where their eldest daughter was born. The other five children were born in this country. The husband and wife resided at Greenwood for a number of years with their family and finally acquired the property known as the Union Hotel, which they conducted for some time, the wife doing the cooking and the greater part of the work incidental to such a business. The property was encumbered. On February 1, 1928, both joined in a lease of said property to one Vellutini upon negotiations conducted by the defendant. The lease contained a provision that the deceased should ''continue to work in said place and attend to the kitchen and board the family, receiving in compensation sixty dollars per month for her services in said place.'' The lease provided for an option to purchase said hotel property. The terms and conditions of said lease and option having no bearing on the questions presented by the appeal, no further consideration will be given to that subject.

The domestic relations of the defendant and his wife had, for many years prior to the homicide, been frequently openly disturbed. The evidence is overwhelming that he was unusually cruel in his general course of treatment of his wife and children and upon several occasions in bursts of anger, aroused by an excessive use of intoxicating liquors, he inflicted physical injuries upon his wife and on one occasion upon his eldest daughter. His children held him more or less in dread. His notion, as expressed by him, was that he should keep them reminded that he was the ''boss.'' 'He was also addicted to the excessive use of intoxicating liquors. The wife had made repeated complaints to the justice of the peace of the township in which Greenwood is situate that her husband had made threats against her life and she feared he would execute his threats, but when told that nothing could be done unless she made a formal criminal charge against him, she refused to make such charge, giving as her reason that she did not want her husband in jail, and that she would not do it. He was arrested and detained in jail for a short time upon one occasion for a battery made or assault committed upon said daughter.

The wife finally filed an action for divorce against defendant in the superior court of the county of Mendocino,

charging him with treating her extremely cruel. The defendant consulted a lawyer upon several occasions, and, while he made no formal appearance and his default was entered, he was present at the hearing of the proceeding. Following the conclusion of the proceeding, to wit, on October 31, 1928, the court made its interlocutory decree, which was thereafter filed with the clerk, granting the wife a decree of divorce from the defendant and appellant upon the ground of extreme cruelty. The decree awarded the care, custody and control of the minor children to the wife and also directed that defendant pay to his wife the monthly sum of $50 for the care, education and maintenance of said minors. The hotel property, found to be community property, was assigned to the wife absolutely as her separate property.

For some time prior to the homicide the defendant was in and out of Greenwood, visiting in San Francisco and elsewhere. In August or September, 1928, he fell from a fruit-tree while engaged in gathering fruit near Santa Cruz and suffered a fracture of the leg and received minor bruises about the shoulder and head. Said injuries in no way affected his mentality.

Subsequent to the execution of said lease defendant began to suspect that undue intimacy existed between Vellutini and his wife. Mrs. Croce and her children occupied rooms on the ground floor adjoining the kitchen. Several of her children shared the room with her. Vellutini occupied a room on the second floor facing the stairway. The defendant claims that upon one occasion he and a friend of his made an unexpected entry into the lower floor of the hotel and Vellutini made a rapid exit from Mrs. Croce's room. Other incidents which were related by him would likely have a tendency to arouse suspicion in a husband who had reasoned himself into the belief that his wife had transferred her affections from him to another. Those who were in the best position to generally observe Mrs. Croce's actions, as well as her children, resented the suggestion that there was any ground for defendant's belief that the relations between her and Vellutini were improper. Her reputation for chastity seems to have been above suspicion so far as the neighborhood was concerned. It is clear from the evidence presented upon said proceedings that the de-

fendant grew more suspicious as time went on and upon one occasion Vellutini ejected him from the hotel because of his accusations as to said improper relations with Mrs. Croce. Throughout all the period of domestic trouble and practically at all other times mentioned herein, the defendant was more or less affected with intoxicating liquors. He was seldom, if ever, in a condition of total incapacity, but was habitually under its irritating influence. He complained bitterly to others upon a number of occasions of being deprived of the care, custody and control of his children and the orders assigning the community property to his wife and requiring him to pay the sum of $50 for the education and maintenance of said minors. The wife, he claimed, was training the children to have nothing to do with him and he was not allowed to visit with them. He had made threats against the lives of both Vellutini and his wife. About a month prior to the homicide he purchased a pistol and cartridges. Returning to Greenwood about a week before the homicide with a friend, he took a room next door to the Union Hotel. He sent his friend to talk with his wife and inform her that if she would give him $250 he would leave Greenwood, knowing that she was in an uneasy state of mind as long as he was near her. She replied to the request or demand that before giving it to him she would burn it in her kitchen stove. This answer was conveyed to defendant and seemed to have perceptibly stung him, as did other refusals of his propositions.

On Christmas day he met one of the children and asked the child if he could eat Christmas dinner with the children and the child replied that it did not know. His testimony is that he went to his room in the hope of being called when dinner was to be served, but he waited in vain for a call. Afterward he ate with a friend. That night he went to bed at an early hour, meditating upon what his course should be. He arose at his usual wakening hour, at about 5:30, armed himself and placed himself at the kitchen door, knowing that his wife would resume her duties at about that hour. His testimony was that he intended to shoot either Vellutini or his wife, whichever he should first see. The wife was the first to present herself. Without uttering a word, standing at a distance of not

more than a few feet from her, he began firing at her and fired four bullets into her body, in rapid succession, two of which inflicted mortal injuries. She ran to her eldest daughter's bedroom, mortally wounded, screaming, "He killed me; he killed me; I knew he would do it some day." The suddenly awakened daughter laid her across her bed, where she expired a few minutes later. The defendant being familiar with the adjoining premises, ran to and concealed himself in the lower room of a tankhouse, located some seventy-five feet from the place where he fired the shots, where he remained until discovered some three hours and a half thereafter. He had reloaded his pistol and remarked thereafter that he had plenty of cartridges left for Vellutini had he appeared. He was observed in the tankhouse by a little girl and soon thereafter Sheriff Byrnes, who had arrived from Ukiah, the county seat, in company with another officer, Conway, walked out to the tankhouse and the sheriff called to him that he wanted to see him and the defendant answered "all right" and came out. He said he had been waiting for the sheriff to arrive to surrender himself to him. He was placed under arrest and on the following day made a statement in which he specifically detailed the grounds upon which he predicated charges of his wife's infidelity and he went at some length into what he claimed to be the causes that led to his separation from his family and prompted him to commit the crime. The causes stated by him were put in the light most favorable to himself and may be epitomized in the following excerpt taken from his somewhat lengthy statement:

"Then Christmas come, the 25th, and my brother come in from Santa Cruz to have Christmas with the family, because my brother he loan me the money to buy the hotel. I tell my kids on the outside, 'You think Mama let me go inside and eat dinner with you kids and my brother too, like we used to do before?' Last Christmas I was in the hospital, and those kids say 'I don't know,' and I say 'That's all right,'—I get disgusted. Q. That was on Christmas morning? A. And all of the people say 'What's the matter they don't let you go inside?' and I say if I catch Vellutini there I shoot Vellutini and if I catch my wife I shoot her,—which one show up first. I wanted to

clean up the scandal. Q. You had it in your mind that you were going in there and find Vellutini,—if you found him you would shoot him and if you didn't find him you would shoot your wife? A. Yes. Q. And early yesterday morning you made up your mind you were going in the hotel and if Vellutini was there you would shoot him and if not you would shoot her,·is that right? A. Yes. Q. So you went to the hotel? A. In front of the back door at five o'clock in the morning and she open the door and I see my wife and I shoot her. Q. What did you have? A. Pistol,—thirty-two; I never thought to kill her with a small pistol like that. Q. She opened the door and you just shot her? A. I shot her two times and after I look I see four shells; I was crazy. Q. When she came to the door you didn't look for Vellutini at all? A. She was alone; Vellutini was not there; he don't get up. Q. What did you do then? A. I just shoot her in front of the door and I run around to the tankhouse and wait for the sheriff to come down; I could tell the sheriff's voice and then I come out. Q. Was she facing you when you shot her,— were you looking at her or she looking at you? A. To tell you the truth I don't know nothing about it. Q. Had you been drinking? A. No, sober. Q. Hadn't had a drink all night. A. No, I make up my mind to finish that scandal, that's all. Q. When did you make up your mind to do that,—to kill one of them,—yesterday morning or day before? A. Christmas night. Q. When you asked the children if they would let you and your brother eat dinner and they said they didn't know, then you made up your mind soon after that you would kill them? A. Yes, that's right.''

Three attorneys of recognized ability and high standing at the bar of this state were appointed by the court to represent the defendant, and a fourth attorney, ranking equally as high, was added in place of one who had withdrawn from the case. Without hope of compensation they devoted themselves unsparingly to defendant's cause, and became earnest, if not exceptionally zealous, advocates in his defense. Upon arraignment the general plea of not guilty was entered and also the special plea of not guilty by reason of insanity. ■ Upon the day of trial, after mature deliberation, the defendant, through his counsel,

was permitted to withdraw his former general plea of not guilty and the special plea of not guilty by reason of insanity and enter a general plea of murder in the first degree. This action under the statute foreclosed any question of defendant's sanity at the time the homicide was committed. (Sec. 1026, Pen. Code, as added by Stats. 1927, p. 1149, sec. 4.) ■ On this issue, however, it is proper to observe that there was no question but that the defendant was legally responsible for the crime committed, as the testimony of many witnesses, including his own testimony, indisputably proved that he fully understood the nature and quality of the act he committed and he knew it was wrong and a violation of law to commit it.

At the proceedings had upon the withdrawal of said pleas the defendant was personally interrogated by the trial judge as to whether or not he desired to enter a plea of guilty, and he replied that he did, and, when asked what his plea was, replied: "I plead guilty, I shoot her, but don't intend to kill her." The court, not being satisfied with that sort of plea, asked the defendant the pointed question as to whether he plead guilty to the charge of murder and the defendant gave the following qualified answer: "Not murder; I don't know what I was doing." Again the court insisted that he must enter an unqualified plea to the charge of murdering his wife and the defendant replied: "I plead guilty, but I don't try to do that." Again the court asked the defendant if he plead guilty to the charge of murder and the defendant responded, "No, not murder; I plead not guilty to cold blood." At this point one of the attorneys interceded and explained to the court that the defendant wished to enter a plea of guilty provided he be permitted to produce evidence in mitigation of the punishment. The trial judge then said he wished to know if the defendant entered a plea of guilty to the charge of murder. The defendant thereupon replied, "Yes; I want my witnesses and everything." The court informed him that he could have his witnesses at the hearing and again asked if he plead guilty to the crime charged against him and the defendant answered, "Yes." It is very clear from the proceedings that the defendant, before entering his plea of guilty, wanted to be assured that he

would have the right to offer evidence in order to reduce the punishment from the death penalty to life imprisonment or a lesser punishment and did not purpose to prejudice any right in that respect by his plea. The plea having been entered, the jurors present to try the cause were dismissed. The prosecution thereupon proceeded with its witnesses to establish the facts and circumstances of the crime and the defense was allowed until the following day to offer evidence in mitigation of the punishment. At the conclusion of the proceeding conducted for the purpose of determining the degree of the murder of which the defendant was guilty and whether there existed any facts or circumstances which would warrant the court in mitigating the punishment from the death penalty to imprisonment, during which much evidence was adduced directed to the mental status of the defendant, the trial judge announced that nothing appeared in the evidence that would warrant him in relieving the defendant from the extreme penalty of the law, as the evidence showed without conflict that the defendant was guilty of wilful, deliberate and premeditated murder. ■ The court thereupon determined that the defendant must suffer death for his crime and set a day certain for pronouncing judgment, on which day counsel for defendant, upon the reconvening of court, moved for the arrest of further proceedings, particularly the pronouncing of judgment, and requested that the question as to the present sanity of the defendant be determined by a jury under the provisions of section 1368 of the Penal Code and other kindred sections. Counsel, in making his motion, stated that the defense had no further evidence to offer touching the issue of defendant's present sanity, but thought the evidence taken in the proceedings was sufficient to create a doubt in the mind of the court as to the sanity of the defendant and specially stressed the testimony of one of the attorneys for the defendant in the case and the testimony of another attorney who had withdrawn from the case. The ground urged was that said attorneys testified that they were not able to get rational assistance from the defendant in the preparation of his case and believed his mind to be impaired. The argument stressed in the court below and repeated here is that the defendant, by

slaying his wife, "thought he was righting a worse wrong in correcting the scandal going on in connection with his family." At the conclusion of full arguments on the motion to submit the issue of defendant's then mental condition to a jury, the court denied the motion and pronounced the formal judgment that defendant suffer death as the penalty for the murder of which he stood convicted.

We have read the entire record of the proceedings had in the trial court, which includes the testimony given by the defendant at the hearing, and fail to find any substance in the contention that the evidence was sufficient as a matter of law or fact to create in the mind of the court a doubt as to the sanity of the defendant. Applying the rules by which human motives are ordinarily determined, the act of the defendant was attributable to a feeling and was consummated with a purpose of avenging the losses which he had sustained in both property and family relationship from causes which he insisted at the hearing he was not the cause of and from which he should not be made to suffer. The testimony of the defendant is a complete refutation of the claim that he was unable to give assistance to his attorneys in the conduct of his case. The familiar rule formulated by Blackstone and since restated by appellate courts of this state (*People* v. *West,* 25 Cal. App. 369 [143 Pac. 793, 794]) is in these words:

"Also, if a man in his sound memory commits a capital offense, and before arraignment for it he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he had pleaded, the prisoner becomes mad, he shall not be tried—for how can he make his defense? If after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced and if after judgment he becomes of nonsane memory execution shall be stayed, for, peradventure, says the humanity of the English law, had the prisoner been of sound memory he might have alleged something in stay of judgment and execution."

The foregoing rule does not fit the appellant's case. He showed a good memory and was able to reason from cause to effect and recounted his domestic difficulties covering a

series of years with meticulous detail. He fixed dates and named places and persons in the narration of his matrimonial troubles with more than ordinary accuracy, and he gave his story at least the show of plausibility. Aside from the strength of his own testimony as to his sanity, witnesses were called who had known the defendant for a number of years and gave added evidence of his present sanity at the hearing, as well as at all other times during their acquaintanceship with the appellant. It is the law that the burden of proving insanity is upon the party asserting it. There could exist.no doubt as to the soundness of the trial court's determination of this issue if the rule had been the reverse.

In two comparatively recent cases, *People* v. *Gilberg,* 197 Cal. 306 [240 Pac. 1000, 1002], and *People* v. *Sloper,* 198 Cal. 238 [244 Pac. 362], we had occasion to construe section 1368 of the Penal Code, which cases may be cited in affirmance of the trial court in the instant case. In *People* v. *Gilberg* the court said:

"The existence of a doubt as to the sanity of the defendant means, of course, any doubt that may be created in the mind of the trial court arising from a consideration of all the facts and circumstances which the situation may disclose, and he may, upon his own motion, in the exercise of a sound discretion, submit the question of the defendant's sanity to the determination of a jury. Such a doubt must be supported by facts and circumstances of a substantial character. This right does not arise merely because the defendant asserts insanity, however baseless the claim may be. To justify the dismissal of the jury or the suspension of a trial the court must entertain a doubt founded upon substantial grounds. In other words, there must exist reason to believe that the claim of insanity made on behalf of the accused is genuine and not simulated as a means of defeating or delaying the law's penalties in cases where all other means of evading punishment would seem hopeless. *People* v. *Fountain,* 170 Cal. 460 [150 Pac. 341], is in point."

On the question of judicial discretion the decision continues: "In the determination of this question, as in that of any other fact from oral evidence, he [court] of necessity, must be the best judge of what the evidence shows, since he has before him many elements of facts which can-

not be transmitted to paper, but which enable him to more correctly weigh the evidence, and exercise a wiser discrimination as to what it shows than one who reads but a naked statement of the evidence, without the presence of the witness. And so it has been held, 'and wisely, that the trial judge is to be accorded wide discretion and latitude in this respect; and his ruling will not be disturbed except where the evidence is so lacking as to leave no just room for question that the discretion has been improperly exercised. (*People* v. *Pico,* 62 Cal. 53; *Estate of Carpenter,* 94 Cal. 414 [29 Pac. 1101]; *People* v. *Lane,* 101 Cal. 516 [36 Pac. 16]; *People* v. *Schmitt,* 106 Cal. 52 [39 Pac. 204].)''

There is no room for the claim that the court in any manner abused its discretion or acted arbitrarily in the slightest degree. On the other hand, the court was patient, indulgent and liberal in its rulings and conducted the proceedings in a manner which well becomes a trial court sitting in a hearing in which the right of a human being to live is the issue to be decided. We find that the defendant was denied no substantial right.

Judgment and orders affirmed.

Shenk, J., Richards, J., Waste, C. J., Langdon, J., and Curtis, J., concurred.