[Crim. No. 4614. In Bank. July 30, 1945.]

. THE PEOPLE, Respondent, v. WILLIAM MARVIN
LINDLEY, Appellant.

Desmond A. Winship for Appellant.

Robert W. Kenny, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

EDMONDS, J.—When he was charged with having murdered a 13-year-old girl, William Marvin Lindley pleaded not guilty, but before the date set for trial it was brought to the attention of the court that a doubt had arisen concerning his sanity. Following a hearing upon that issue he was committed to the Mendocino State Hospital. Ten months later he was released to the sheriff and brought to trial upon the murder charge. The case is now before this court upon an automatic appeal from the judgment imposing the death penalty which was entered upon the verdict of the jury finding him guilty and the order denying a new trial.

The record discloses that on August 16, 1943, two days before Jackie Hamilton, the victim of the tragedy, was found under conditions which resulted in her death shortly afterward, she had arrived at Yuba City with her father and mother and three sisters, Willa Mae, Barbara, and Shirley, who were then 17, 15, and 3 years of age, respectively. The family established a camp at a place which was between the levee of the Feather River and the stream. Clumps of trees dotted the area and the terrain was irregular. Some 200 yards to the northeast, built directly on the stream, was a boathouse inhabited by William Owens, his nine-year-old son, a man called Shorty, and Lindley. Owens had known Lindley for about five years and had always called him "Red." The men maintained a store in the boathouse, selling soft drinks and merchandise to the riders and campers who frequented the vicinity.

The Hamilton family made camp about noon on Monday

but did not go to the boathouse that day. On Tuesday, Barbara went down to find out where they could get water, and visited the boathouse several other times. The next day, a little boy took the three older girls, Willa Mae, Barbara and Jackie, across the river in a boat. On the opposite bank they saw a sheepherder and his flock. When they returned Barbara and Jackie went in swimming, and later Willa Mae joined them.

Meanwhile Mr. Hamilton had become acquainted with the men at the boathouse. He agreed to drive Owens and "Red" to a place a few miles outside the city where they could collect wages due them for peach picking. The three men left in the automobile shortly after noon. Some time later Barbara and Jackie left the water. They went up to the boathouse to change to dry clothing. Shorty was the only man there, and he told Jackie to wrap herself in a blanket and get her clothes from a tub in which she had placed them. She did so, and Barbara helped her dress in the men's restroom. Jackie then said she would go back to camp.

Willa Mae, still in the water, saw "quite a ways off," "a man with a brown hat and khakis . . . in the willows. . . . It looked like he was shaking a pole going back and forth. Shaking the willows." About this same time, which was probably around 2 o'clock, the three men had returned from town after completing their errands and making grocery purchases, and within five minutes after their arrival "Red" had taken some ale which they had bought and walked with it in the direction of the boathouse. Owens had stayed in camp to visit with Mr. and Mrs. Hamilton.

"Red" was wearing a khaki suit, a "kind of brown khaki," shirt and pants, and a brown hat. It was a brown hat, or one similar to it, that had been given to him by Owens.

When Jackie reached the camp, 200 yards from the boathouse, her father, Owens, her mother and Shirley were there but "Red" had left. Owens was drinking from a jug of wine bought in town; Mr. Hamilton had about two tablespoons of it. Jackie did not mention having seen "Red" on the way. She stayed only about five minutes and then walked back toward the river. During this brief interval Barbara was at the boathouse; Willa Mae had left the water and started back to camp for dry clothes. The man was still in the willows when she left the river, so she took the trail to the house,

without passing the place where he was. "He was there when I got through swimming," she testified, "in the willows and I just went on to the house. I kind of got scared and went to the house." She did not recognize the man as anyone she had seen and she had never met "Red." After reaching camp she stayed there quite a while, then changed her clothes and took Shirley down to the boathouse. On the way there, she did not see or look for the man in the willows.

Meanwhile at the boathouse "Red" had come in and joined Barbara and Shorty about 15 or 20 minutes after Jackie left for camp. He did not mention having stopped in the willows on the way, or having met and injured Jackie, if he did so. His whereabouts over the period of 15 minutes is not accounted for unless he was the man in the willows. He sat around drinking beer and smoking one cigarette after another.

Five or six minutes after "Red's" arrival, Willa Mae came in with Shirley, and about 15 or 20 minutes after that two boys, Richard and Lawrence, who were riding horses, stopped at the boathouse. The group talked for 20 or 25 minutes and then the two boys went to get their horses. Willa Mae, the baby and Barbara started to walk toward the camp. A period of 60 or 70 minutes had then elapsed since Jackie left the boathouse and paid her five-minute visit to the camp.

The group of young people came upon Owens sitting on a hump of bermuda grass on the hill. He had left the camp after sitting around with Mr. Hamilton for an hour or an hour and a quarter. He said he was taking sand out of his shoe. That took him three or four minutes, and he then went on down to the boathouse and joined Shorty and "Red." Three or four minutes after he reached the boathouse, and while Barbara, Willa Mae, and the baby were watching the two boys mount their horses, they heard Jackie call out "help, I am drowning," and similar cries. Willa Mae and Barbara were not alarmed as Jackie had been fooling them all morning by calling for help and pretending that she was drowning. Willa Mae went on to camp with the baby and told her mother she guessed her sister had fainted. She knew Jackie had not been well because of successive bouts with rheumatic fever and its effect upon her heart, but she was "gaining and getting very stout. A very healthy looking little girl."

Barbara remarked to the boys, "She is fooling; she has been fooling all day like that," but the boys said they would go down and see. Richard went part way on his horse and

called, "you are not going to drown in the sand." But Jackie had recognized Barbara's voice and said "help, Barbara, help." Then Barbara also cried out for help and the father went to the aid of the girls. He placed the time of the cry as 10 minutes or less after Owens left the camp. It was estimated as 3:15 or 3:20, or an hour and a quarter after the men returned from town.

Jackie was lying outside the willows on the sand. She was on her side with her face turned partly into the sand. There was a little spot of blood on her cheek, dry blood in her nose and "great big reddish blue purple spots on her little throat like somebody had hold of her throat." According to her father's testimony, she said, "Daddy, that old red headed man; that dirty liar at the boathouse." Barbara testified that in suggesting to her father, "Daddy, let's take her to the boathouse," Jackie replied, "No, that old man at the boathouse, he did it, the dirty liar." The father also told the jury that she kept saying, "The old red headed man, the dirty liar, did it."

The clothing on the child was torn in front. She had on only the waist and skirt in which Barbara had helped dress her, with no shoes, stockings or panties. The dress had not been torn when she put it on after her swim. She was so weak and bruised she could not walk. With the help of the boys the automobile was brought near and she was placed in it.

The men at the boathouse had heard Barbara scream and holler "Bill" (Owens). Shorty was in the house; "Red" was sitting in front on a box; and Owens was lying on a pad or mattress he had thrown on the floor. Owens jumped up and ran to the automobile, arriving as they were getting Jackie into the car. He asked to ride to the hospital with them. En route they stopped at the sheriff's office for directions and the sheriff, in his car, cleared the road for them to the hospital. The little girl passed away on the operating table about 15 minutes after arrival. This was between 3:45 and 4:15.

The physician who examined her testified: "When she was brought to the hospital she was in very poor condition. As a matter of fact she was breathing her last. She was quite blue and you might say she was shocked to death. . . . The cause of death was asphyxiation. . . . It can occur from a variety of causes"; it could come from being choked. He said the girl bore no evidence of drowning. But coming to consciousness

after being choked and left with her face in sand might induce the same sensation as drowning.

An autopsy revealed marks on the girl's body, those on the throat not deep enough to bleed, such as might have been caused by fingernail scratches. There were two abrasions on the lower part of the abdomen inside the pelvic bone, and an abrasion just within the vaginal wall, inside the vagina. The abrasions near the groin were about the size of a quarter each, where the skin had been rubbed off, and they could have been caused by a hard object such as a knee being pressed upon that portion of the body. The abrasion inside the vaginal wall was "Just where the skin had been rubbed off," and could have been caused by the "insertion of anything." The physician testified that the girl's heart condition, caused by rheumatic fever, was not the cause of her death.

In further explanation of the cause of death, the doctor said that if a person "were actually strangled and oxygen prevented from getting in," death would occur right away but that it was hard to tell how long before arrival at the hospital Jackie was choked; that if she were strangled but not completely choked to death and became unconscious, she might live until enough fluid collected in her lungs to kill her. "It might be quite a period of time." A heart attack, he stated, would not have caused the girl to grab her own throat, and there was no evidence of such an attack or of self-inflicted wounds.

A deputy sheriff who was immediately dispatched to the scene of the crime testified that the ground showed some evidence of a struggle there but "not a great deal"; that "it is pretty heavy sand." In walking in the neighborhood he picked up a pair of torn panties like the pair Barbara had helped Jackie put on after the swim. None of the clothing in which Jackie dressed at the boathouse was then torn.

The sheepherder whom the girls had seen across the river was a 16-year-old grammar school boy, then in the seventh grade. At the trial he gave testimony which, along certain lines, such as that regarding the color of bathing suits, showed a tendency to give an affirmative answer to each question asked, although his replies were inconsistent. But on certain basic points, under cross-examination and recross-examination, he was unshakable.

He testified positively that while sitting under a tree he had watched two girls swimming. He saw them leave the water

and enter the boathouse. He later noticed one of them go toward home and then observed a girl come down to the water and wash her feet. When she went back toward the levee, he said, she started fighting with "Red" and they went down behind the willows. He positively identified "Red" as one of two men he had seen around the boathouse during the previous two weeks, and said that on the afternoon Jackie died he saw "Red" walking back and forth in the willows, wearing a brown hat, brown pants, and brown shirt. He picked "Red" out in the jail, there learning his name, and recognized him in the courtroom, even against suggestions of other identity.

In his account of what he saw, the boy said that he heard the cries for help about 15 minutes after the fight. He had then left his position under the tree and walked 200 or 300 feet toward a tomato patch. He told his father and mother when they came down to see the sheep that afternoon of all he had witnessed, and later told the sheriff. His position on the east side of the river gave him a clear view of the willows area; he could have seen a man above the height of the willows and distinguished colors and persons.

At the time of Lindley's arrest, George Main was in the county jail on a charge involving a girl slightly under 20 years of age. Main was assigned to cook for the other inmates and had opportunity for conversation with them. He told the jury that in talking with Lindley a week or so before the trial, the man seemed to be in a normal state of mind and said to him: "You are a mind reader; I am guilty and you know it. I might as well tell you I followed this little girl to the river and grabbed her and choked her and throwed her in the bushes and went back to the bunk house for an alibi." Main reported the remark to the sheriff, but, he testified, not for the purpose of securing any advantage for himself.

Lindley is a man who has had little, if any, education. He can write his name but is unable to read. He is a native of Texas and was convicted of burglary in that state. At the time of his trial he was 49 years of age. As a witness in his own behalf, he recalled seeing Jackie down on the river, but claimed that when he returned from town he went directly from the camp to the boathouse, joining Shorty, Barbara and the others there. He denied any confession to a fellow prisoner. He also told the jury that when Jackie was found

and the call for help came he went up to the car and made inquiry as to what had occurred.

The judgment based upon this testimony is challenged upon four grounds. First, it is said, the record shows no evidence that Lindley had regained his sanity. The second point relied upon for reversal is the asserted insufficiency of the evidence to establish that Lindley committed the homicide. As also justifying a new trial, counsel points out that the evidence is insufficient to establish the crime as murder of the first degree. Finally, complaint is made of certain instructions to the jury.

The contention that there is no evidence tending to prove Lindley's sanity at the time of the trial is based upon the sheriff's failue to produce a certificate signed by the superintendent of the state hospital showing that he had been discharged from that institution. This point, however, was mentioned for the first time on the motion for a new trial. Although at the opening of the trial, Lindley's counsel stated that he still doubted defendant's sanity, and he unsuccessfully moved the court to determine the question, no further objection was made then or at any time prior to the verdict and judgment.

Section 1372 of the Penal Code reads: "If the defendant is received into the state hospital he must be detained there until he becomes sane. When he becomes sane, the superintendent must certify that fact to the sheriff and district attorney of the county. The sheriff must thereupon, without delay, bring the defendant from the state hospital, and place him in proper custody until he is brought to trial or judgment, as the case may be, or is legally discharged."

The Legislature has made no requirement that the certification of sanity be in any particular form or that it be produced in court as a prerequisite to the right to proceed to trial. It is, as stated in *People* v. *Superior Court*, 4 Cal.2d 136, 147 [47 P.2d 724], "at most, merely a formal statement made to the sheriff and district attorney that the defendant is not insane, and there is in fact no specific requirement that it be filed, nor does there appear to be great reason why it should be." In the case of Lindley, it appears that the sheriff received a notice from the hospital, as did also the district attorney. There is nothing to indicate that a sufficient certification of sanity was not duly made or that, if demanded, it could not have been produced. At the commencement of the

trial the judge remarked in open court that "the man has been returned to this court as sane." The presumption, in the absence of evidence to the contrary, is that the duties of the superintendent and other officials were properly performed, that the defendant was duly discharged from the hospital and that he was brought into court in the manner prescribed by statute. (*Maloney* v. *Massachusetts etc. Co.,* 20 Cal.2d 1 [123 P.2d 449] ; *People* v. *Superior Court, supra; People* v. *McGee,* 24 Cal.App.2d 391 [75 P.2d 533] ; *People* v. *Howard,* 134 Cal.App. 441 [25 P.2d 498].)

■ Section 1368 of the Penal Code provides: "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined. . . ." The "doubt" mentioned is one that must arise in the mind of the trial judge, rather than in the mind of counsel for the defendant or in that of any third person (*People* v. *Perry,* 14 Cal.2d 387, 399 [94 P.2d 559, 124 A.L.R. 1123], and cases there cited) ■ and the determination of a motion for a hearing upon the issue of a defendant's sanity at the time of trial is one which rests within the sound discretion of the court. Necessarily, an appellate court cannot measure to a nicety the basis for the ruling, and the trial judge must always be allowed a wide latitude. (*People* v. *Perry, supra,* at pp. 397-399, and authorities there reviewed, 124 A.L.R. 1123; *People* v. *Cramer,* 21 Cal.2d 531 [133 P.2d 399] ; *People* v. *Croce,* 208 Cal. 123, 131-134 [280 P. 526] ; *People* v. *Gilberg,* 197 Cal. 306, 311-312 [240 P. 1000] ; *People* v. *Keyes,* 178 Cal. 794, 801-802 [175 P. 6] ; *People* v. *Fountain,* 170 Cal. 460, 467 [150 P. 341] ; *People* v. *Hettick,* 126 Cal. 425 [58 P. 918] ; *People* v. *Geiger,* 116 Cal. 440 [48 P. 389] ; *People* v. *Kirby,* 15 Cal.App. 264, 269 [114 P. 794] ; 8 Cal.Jur. § 270, p. 195; 4 Cal.Jur. 10-Yr.Supp. (1943 rev.) 721; 142 A.L.R. note, p. 961, at p. 983.) Certainly there is nothing in the record of the present case indicating an abuse of discretion. On the contrary, it appears that the trial judge was well aware of his statutory duty, for in denying the motion for an inquiry into Lindley's sanity at that time he ruled: "The question has once before been raised and the man has been returned to this Court as sane. The Court has no other discretion but to proceed with the criminal case and if it should develop during the trial the Court may stop proceedings at any time." More-

over, Lindley took the witness stand and gave perfectly lucid testimony in his own behalf and the reporter's transcript shows nothing which occurred during the course of the trial tending to raise any "doubt" whatever as to the defendant's then sanity.

Concerning the sufficiency of the evidence to support the verdict of the jury, the testimony of the witnesses for the People shows no material inconsistencies or contradictions. All of them frankly admit to taking no account of time in their movements during the day. Every time estimate given was qualified as being only an approximation, yet much more than a thread of consistency runs through the evidence presented by the prosecution. As the events of the day of Jackie's death were related to the jury, before reaching the boathouse "Red" had ample opportunity to attack the little girl and leave her unconscious at the point where she was found in response to her cries. Unquestionably this testimony and the physical facts are reasonably susceptible of the inference that Lindley went directly from the camp to the willows and was there when Jackie arrived five minutes later. The testimony of Main may have been induced by self-interest, and the sheepherder and Willa Mae were of dull mentality, but the accounts given by Barbara and her father are full and clear, and each of their statements is consistent with the recital of events given by the other witnesses.

There is nothing to indicate that there was any person in the vicinity of the boathouse other than those who were named by the witnesses, and Lindley is the only one described as being dressed in brown clothes and a brown hat. Also, one may conclude with more than reasonable certainty that he is the person to whom Jackie referred as "the red headed man at the boathouse." Moreover, Lindley was positively identified by the shepherd boy as the man whom he saw "fighting" with the little girl. He said: "They went down behind the willows . . . Red got up and then he started back to the boathouse . . . I started off to the tomato patch. I got just around the curve and heard them yell and went back . . . the little girl was yelling for help. . . . I saw a man and lady come over the levee and take this little girl up towards the road." It was the duty of the jury to consider this evidence as against Lindley's categorical denial of guilt and his testimony that upon returning from the automobile trip, he walked down the

road directly to the boathouse. The weight to be accorded the statement of each of the witnesses was a question exclusively for the determination of the jury and the verdict, which received judicial approval upon denial of the motion for a new trial, may not, therefore, be disturbed upon appeal (*People* v. *Farrington*, 213 Cal. 459, 463 [2 P.2d 814]; *People* v. *Erno*, 195 Cal. 272, 278 [232 P. 710]).

Lindley also asserts that the evidence is insufficient to establish murder of the first degree. There is no proof, whatever, he argues, of the commission of that crime.

■ Section 189 of the Penal Code defines as murder of the first degree, "all murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful,.deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem. . . ." Where the murder is committed in perpetration or attempted perpetration of any of the enumerated felonies, the offender "is guilty of murder of the first degree by the force of the statute" (*People* v. *Cabaltero*, 31 Cal.App.2d 52, 57 [87 P.2d 364]; see *People* v. *Murphy*, 1 Cal.2d 37, 41 [32 P.2d 635]; *People* v. *Howard*, 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; *People* v. *Sutton*, 17 Cal.App.2d 561 [62 P.2d 397]). If the evidence establishes conclusively that the murder was so committed, then only a verdict of murder of the first degree may properly be rendered. ■ And even where the showing is not conclusive, if the record affords substantial support for the conclusion that one of the enumerated felonies was perpetrated or attempted, and the killing was committed in such perpetration or attempt, the judgment must be affirmed. (*People* v. *Diaz, ante,* p. 318 [158 P.2d 194]; *People* v. *Brown*, 22 Cal.2d 752 [141 P.2d 1]; *People* v. *Waller*, 14 Cal. 2d 693 [96 P.2d 344]; *People* v. *Green*, 13 Cal.2d 37 [87 P.2d 821]; *People* v. *Martin*, 12 Cal.2d 466 [85 P.2d 880]; *People* v. *Anderson*, 1 Cal.2d 687 [37 P.2d 67]; *People* v. *Miller*, 121 Cal. 343, 347 [53 P. 816]; *People* v. *De La Roi*, 36 Cal. App.2d 287 [97 P.2d 836]; *People* v. *Meyers*, 7 Cal.App.2d 351 [46 P.2d 282].) ■ After conviction all intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatsoever is there sufficient substantial evidence to support it. (*People* v. *Latona*, 2 Cal.2d 714 [43 P.2d 260]; *People* v. *Green, supra; People* v. *De La Roi, supra.*)

██ Lindley contends that here the evidence fails to sufficiently establish either rape or attempted rape; that there is no proof of lying in wait, as distinguished from the mere fact that the murderer was concealed by the willows (see *People* v. *Miles,* 55 Cal. 207; *People* v. *Thomas,* 25 Cal.2d 880, 891 [156 P.2d 7]); and that there is no evidence that the killing was willful, deliberate, or premeditated. But unquestionably the jury reasonably could have drawn from the evidence the inference that the girl was killed in the perpetration or attempted perpetration of rape. When found, she was weak, choking, bruised, and close to death. Her clothing was torn and she told those who came to her aid that she had been attacked by the "old red headed man" at the boathouse. Wounds revealed by the autopsy corroborated her charge.

██ In establishing rape, evidence of any sexual penetration, however slight, is sufficient to complete the crime. (Pen. Code, § 263; *People* v. *Howard,* 143 Cal. 316 [76 P. 1116]; *People* v. *Britt,* 62 Cal.App. 674 [217 P. 767]; *People* v. *Stangler,* 18 Cal.2d 688 [117 P.2d 321].) ██ Counsel argues that none of the abrasions caused bleeding and there was no proof as to when they might have been made. However, it was not essential to establish bleeding and an inference which could reasonably be drawn from the medical testimony is that the abrasions were as newly inflicted as the throat marks. The girl's physical condition, and the marks on her body, coupled with all of the other evidence, amply support the conclusion that death resulted from injuries sustained either in a rape or an attempt to rape committed by Lindley. (*People* v. *Diaz, supra; People* v. *Brown, supra.*) Under such circumstances, the absence of independent proof of premeditation or deliberation is immaterial. The jury, once satisfied that a rape was perpetrated or attempted and that Lindley was the assailant, had no alternative but to return a verdict of murder of the first degree.

The last point presented concerns two instructions which, it is claimed, are erroneous. By them, counsel argues, the jury was instructed that the homicide by Lindley being proved, the burden of proving circumstances of mitigation or that justified or excused it, then devolved upon him unless the proof on the part of the prosecution tends to show that the offense only amounted to manslaughter. Also, the argument continues, the jurors were told that if they found Lindley guilty of murder in the first degree, then in the absence of some extenuating fact or circumstance they should impose the

extreme penalty of the law. By these instructions the jury had no alternative but to find Lindley guilty of murder in the first degree or of manslaughter or to acquit him. If they found him guilty of murder in the first degree, according to the instructions, the burden of proving facts and circumstances of mitigation or that justified or excused the homicide was upon Lindley and in the absence of such proof it was the duty of the jury to not relieve him from the extreme penalty of the law. Moreover, it is contended, the jurors were not adequately instructed as to the difference between murder in the first degree and murder in the second degree.

The first of the challenged instructions is based upon section 1105 of the Penal Code. It reads: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter or that the defendant was justifiable or excusable, *but the burden of proof thus placed on the defendant is discharged and satisfied if it raises in your minds a reasonable doubt as to the defendant's guilt.*" Although the court added to the statute the italicized words correctly stating that a defendant is only required to produce enough evidence of the circumstances of the killing to raise a reasonable doubt of his guilt (*People* v. *Wells,* 10 Cal.2d 610 [76 P.2d 493]; *People* v. *Madison,* 3 Cal.2d 668 [46 P.2d 159]; *People* v. *Post,* 208 Cal. 433 [281 P. 618]) the instruction should not have been given. However, the error, if it may be properly characterized as such, did not prejudice the rights of Lindley. Under the evidence the only crime of which he could have been found guilty was a killing in the perpetration or attempted perpetration of rape, and the degree of that crime is fixed by statute.

By the second instruction relied upon as justifying a reversal of the judgment, the jurors were told that if they found the defendant guilty of murder in the first degree and also that there was some extenuating fact or circumstance in the case, it was within their discretion to specify a sentence which would relieve him from the extreme death penalty. But this discretion, said the court, "is not an arbitrary one, and is limited to determining which of two punishments shall be inflicted, and is to be employed only when the jury is satisfied that the lighter penalty should be imposed. If the evi-

dence shows the defendant to be guilty of murder in the first degree, but does not show some extenuating fact or circumstance, it is the duty of the jury to find a simple verdict of murder in the first degree, and leave the law the responsibility of affixing the punishment.'' In the recent case of *People* v. *Kolez*, 23 Cal.2d 670 [145 P.2d 580], this court adhered to a long line of decisions holding that the giving of such an instruction does not constitute error.

 Nor is the appellant's complaint that the jury was not adequately informed concerning the difference between murder of the first and of the second degree well founded. By four instructions, the trial judge fully and correctly explained the essential elements of each of these offenses.

An examination of the entire cause, including the evidence, shows no error which has resulted in a miscarriage of justice. The evidence quite unerringly points to Lindley as the perpetrator of a revolting crime, and he had a fair and impartial trial fully protecting him in every substantial right. After less than two hours of deliberation, the jury returned its verdict requiring that a sentence of death be. imposed upon him as punishment for his commission of murder of the first degree. The verdict is amply justified by the law and the evidence.

The judgment and the order denying a new trial are, and each of them is, affirmed.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., and Spence, J., concurred.

TRAYNOR, J.—I concur in the judgment. The instruction in terms of Penal Code, section 1105, was erroneous for reasons set forth in *People* v. *Thomas*, 25 Cal.2d 880, 894-896 [156 P.2d 7], and in my concurring opinion in *People* v. *Albertson*, 23 Cal.2d 550, 586-589 [145 P.2d 7]. It is doubtful whether such an instruction should be given even if accompanied by a proper explanation, but in any event the sentence that the court added in its instruction to the text of the section did not explain adequately the meaning of the section. I do not believe, however, that the error was prejudicial in this case; it is improbable that a reasonable jury properly instructed would have rendered a different verdict.

I believe that *People* v. *Kolez*, 23 Cal.2d 670 [145 P.2d 580], should be overruled for the reasons set forth in my dissenting opinion therein. Until it is, however, an instruction like the one there involved is not erroneous.