[Crim. No. 8749. Second Dist., Div. One. Dec. 4, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. HAROLD BROWN PALMER, Defendant and Appellant.

I. A. Kanarek for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant appeals from a bigamy conviction; his attempted appeal from "all other orders" and order denying probation is dismissed. (*People* v. *Walters*, 148 Cal.App.2d 426 [306 P.2d 606].)

Defendant married Martha in 1960 and left her in November 1961; the marriage was never annulled or dissolved by divorce. Prior to the separation, Martha told defendant she wanted a divorce but was financially unable to obtain one and intended to get one when she could. After their separation defendant, who drank considerably, "continually bothered her" and to get him to leave her alone and stop seeing and bothering her, and because she "had so much grief and worry from the marriage," Martha told defendant that—she "was going to get a divorce or had gotten a divorce, maybe"; was "getting a divorce"; was "probably getting a divorce" but "wasn't financially able"; had gotten a divorce and didn't want to see him any more; and had gotten a divorce and to leave her alone. She testified "[H]e had asked me at one time to get the divorce and I asked him to get the divorce and I told him that I wasn't financially able at that time. I wanted one because I didn't want him bothering me any more." She was emphatic that at no time did she ever mention to defendant an annulment or tell him she had obtained one; she mentioned a divorce, "but never an annulment." Neither Martha nor defendant ever filed a complaint for divorce or annulment; no separation agreement or other "papers" were ever prepared or filed; and Martha at no time ever wrote defendant that she had gotten an annulment.

*Three* months after leaving Martha, and on February 5, 1962, defendant married Erma. Erma testified that she knew he had been married before; that he spoke of his former wife and said "they were divorced in November," that "it was final in November"; that "[H]e said it was final. Just said it—he didn't say annulment or divorce; it was final in November"; and that later on he told her "that he had an annulment."

Appellant claims he "had the legal right to rely upon the representations of ... Martha ... that she had obtained a divorce, and, thus ... did not have the requisite, specific intent to be found guilty of violation of Penal Code section 281 when he went through the marriage ceremony with Irma [*sic*] ...." (A.O.B., p. 5.)

It is the rule that one "is not guilty of bigamy, if he had a bona fide and reasonable belief that facts existed that left him free to remarry." (*People* v. *Vogel*, 46 Cal.2d 798, 801 [299 P.2d 850].) However, the question here is not whether he had a legal right to rely on Martha's representations that she had obtained a divorce, but whether defendant, in fact, did rely on her representations and whether, at the time he married Erma, he had a bona fide and reasonable belief that he was free to marry her. Thus, it becomes solely a question of fact—one which the trial court resolved against defendant; the real issue is whether there is substantial evidence to support the determination of the trial court. (*People* v. *Daugherty*, 40 Cal.2d 876, 885 [256 P.2d 911].) After conviction all intendments are in favor of the judgment and the trial court's determination will not be set aside upon the ground of insufficiency of the evidence unless the record clearly shows that upon no hypothesis is there substantial evidence to support it. (*People* v. *Lindley*, 26 Cal.2d 780 [161 P.2d 227]; *People* v. *Crooker*, 47 Cal.2d 348 [303 P.2d 753].) However, a review of the record reveals that even defendant's own testimony fails to support his defense; further, that the trial judge disbelieved both defendant and his sister. Inasmuch as the trier of fact has the exclusive power to resolve factual conflicts, determine credibility of witnesses and weigh the evidence (*People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778]) and there is substantial evidence to support its finding, we will not substitute our determination for that of the trial court.

According to defendant's testimony, when he married Erma his reliance, if any, was not on Martha's representation "that she had obtained a divorce" (A.O.B., p. 5), but on her statement to him in November "that she had an annulment." (Martha denied she had ever mentioned annulment to defendant.) Of more significance, however, is the clear showing in defendant's testimony of his complete lack of bona fide and reasonable belief that Martha had actually obtained either a divorce or an annulment. In his own words, when he married Erma, he "didn't know what to believe."

Defendant's uncertainty of his marital status and his doubt of the truth of Martha's representations that she had dissolved the marriage, are reflected in his testimony concerning: her conflicting statements to him and the circumstances under which they were made; his continued discussions with her concerning a divorce or annulment for the next two months following her statement in November "that she had an annulment"; his request of her to see the "papers," indicating he knew papers were necessary for a legal dissolution of the marriage and didn't believe her; the note *he* wrote her in January 1962 declaring she had an annulment, not a divorce, to which he secured her signature; and his admission, after considerable cross-examination, that he "didn't know what to believe." Without question defendant, knowing Martha had not been out of the state and a final decree was necessary, wrote the note in January 1962 for her signature in the final realization that no matter what she had told him in November it would have been impossible for her to have obtained a divorce in one month.

The inconsistencies and contradictions in defendant's testimony and his obvious attempt to tailor it to fit certain established facts clearly reveal his lack of any honest belief that he was free to remarry. His direct examination was very brief; he simply testified that he believed, and relied upon, Martha's statement to him that she had obtained a divorce. However, on cross-examination and thereafter, he changed his story—repeatedly stated that what he relied upon was Martha's statement to him that she had gotten an *annulment*. He testified variously—he thought "it was an annulment. That is what I understood"; "... one time she told me that she had an annulment—a divorce and then she told me an annulment, so I knew it was one or the other," and she told him this "in November ... just about a month after" his separation; she didn't tell him where she got the annulment or divorce; he asked her for the "papers" and "she just asked me what I wanted them for"; he didn't know where she had gotten "it" and didn't know if she had been out of California; and he visited her all during this period and as far as he knew she had been in the state. When he was asked if he knew at the time (November) that "it takes a year to get a divorce in California" he testified: "Well, she told me that she had an annulment"; when it was pointed out to him that only a month had elapsed making a divorce questionable, he said that in November she

"told me that she had an annulment one time and another time a divorce so *I didn't know what she had, to tell the truth about it*"; when asked by both the court and the prosecutor if he didn't think it unusual that Martha got a divorce in just one month, he admitted, "Yes, I give it thought. I believe that she had an annulment like she told me she had"; pressed further, defendant said: "Well, *I didn't know what to believe*"; and then, "I believed that she might have made a mistake and said divorce and meant annulment. *I didn't know* what she - -." Finally he was asked: "As a matter of fact, Mr. Palmer, you knew she couldn't get a divorce in just one month," and he answered: "I didn't figure that—I don't—I wasn't thinking about the divorce at the time. I was thinking of annulment"; then asked if, when he married Erma, he was relying upon what Martha told him in November, defendant said: "Not exactly. I had a - - - *yes,* I was too. I believed that she had an *annulment* like she told me." Defendant was questioned thoroughly concerning the divorce upon which he claimed in his direct examination he relied, and after the prosecution explored the time element involved and the lack of "papers," he resorted to: "I believed that she had an annulment," and finally said "A divorce or annulment, I didn't know exactly which . . . ."

On redirect examination defendant, for the first time, claimed that Martha signed a note declaring that she had an annulment, but on recross-examination it developed that defendant himself wrote the note. He testified that in January 1962 he, Erma and her sister took the note to Martha, "handed it to her through the door" and asked her to sign it, and she did; that he can't "locate the note" and doesn't know where it is now but his sister saw it and he showed it to Erma. He further claimed that later in January Martha wrote him a letter saying she had an annulment, but that he "never could find it," and doesn't know where it is now, but that he showed it to his sister. Defendant's sister testified that in middle January he showed her a letter written by Martha which said she had gotten an annulment; that she read just the part relative to the annulment "because it was of interest" to her; and that when defendant brought the letter to her he said: "This letter says she has gotten an annulment," although he never before had mentioned "annulment" to her.

In rebuttal, Erma denied that she ever saw such a note signed by Martha, that defendant ever discussed it with her or

ever showed her such note, and that before their marriage she went with him to Martha's; Martha testified that she "never wrote him anything," no documents "at all" pertaining to any subject, and denied writing any letter to him, but said she did sign "something" that he brought out, "she really didn't know what it was," she didn't read it "because he is always writing something and he was drunk and he didn't know what he was doing anyway."

At the time the trial court found defendant guilty it indicated its liberality in bigamy cases, but declared this to be "an unusual type case in that defendant, it is obvious to me, he knew very well he didn't have any divorce"; relative to the testimony of defendant's sister, the judge said: "It appears to me that she told a bold-faced lie in court," and "obviously there was no such letter."

While *People* v. *Vogel*, 46 Cal.2d 798 [299 P.2d 850], heavily relied upon by appellant, holds that *if* one had a bona fide and reasonable belief that facts existed that left him free to remarry he could not be guilty of bigamy, it does not hold, as urged by appellant, that a statement made by the wife that she obtained a divorce constitutes sufficient proof of such belief. The issue therein was not the sufficiency of the evidence, it was whether the lower court erred in refusing to admit testimony that defendant's first wife had told him she was going to divorce him; and the Supreme Court held that it did. The record before us reflects an absence of proof that when defendant married Erma he had a bona fide and reasonable belief that his marriage to Martha had been dissolved. Inasmuch as the trial judge completely rejected the testimony of defendant and his sister, his misstatement of one point in the evidence at the time he found defendant guilty was no more than harmless error.

 Sentenced to the state prison, appellant claims that "the possibility of a county jail sentence" was not fully explored. Defendant was charged with two prior felony convictions—"forgery" and "no account check"—and the court found the allegations to be true. The finding on the priors made defendant ineligible for probation. Before sentence defendant's counsel called his client's ineligibility for probation to the court's attention, argued at length the nature of the priors, discussed defendant's alcoholic problem and need for medical attention, urged he be placed on probation and asked the court in the interests of justice to strike out one of the priors that defendant might be eligible for probation. His

application for probation was denied. Counsel not only had every opportunity to explore and discuss the possibility of a county jail sentence, but he talked to the court at length on defendant's behalf; however, the trial judge, having heard the evidence, read the probation report, listened to defendant's argument and considered the nature of the two priors, apparently felt that the interests of justice did not justify a county jail sentence. We see no abuse of the court's discretion and no error.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied December 23, 1963, and appellant's petition for a hearing by the Supreme Court was denied January 29, 1964.