[Crim. No. 5359.   In Bank.   June 19, 1953.]

THE PEOPLE, Respondent, v. LLOYD GOMEZ, Appellant.

Peter Mannino and C. K. Curtright for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier, Deputy Attorney General, and J. Francis O'Shea, District Attorney (Sacramento), for Respondent.

SCHAUER, J.—Defendant was charged with the murder of Warren Hood Cunningham. He pleaded not guilty and not guilty by reason of insanity. A jury found him guilty of first degree murder and fixed the penalty at death. Thereafter the jury found that defendant was sane at the time of the commission of the crime. This is an appeal (as provided for by subdivision (b) of section 1239 of the Penal Code) from the resulting judgment of conviction and from an order denying defendant's motion for a new trial. We have concluded that defendant was fairly tried and, under applicable law, correctly sentenced.

The record establishes the pertinent facts as hereinafter related. Defendant is a schizophrenic with an intelligence quotient of 61. Five psychiatrists, three of whom were appointed by the court and two of whom were witnesses for defendant, gave expert testimony, at the first stage of the trial, as to defendant's ability to form a wilful, deliberate, and premeditated intent and to harbor malice aforethought at the time of the killing, and, at the second stage of the trial, as to his legal sanity at the time of the killing. These were the principal matters in issue at the trial. Another important question on which there was psychiatric testimony arose before the trial, when defendant's counsel sought to raise in the mind of the trial judge a doubt as to defendant's then existing sanity, so as to require the suspension of the prosecution and the trial (before

a jury, if requested) of the issue of such sanity.[1] The facts pertinent to resolution of the suggested legal questions follow.

The killing took place in the "American River Jungles," an undeveloped area near Sacramento where from time to time migratory workers made camps. The deceased Cunningham, the defendant Gomez, and John Kapusta, the one witness of the killing, were staying at separate places in the area. Defendant had stolen two cans of beer from Cunningham. On November 11, 1950, Cunningham encountered defendant, charged him with having stolen the beer, and brandished two knives. Defendant fled. Cunningham pursued defendant for a short distance, then abandoned the chase. Defendant went to his camp, prepared and had supper, and dug up a .22 bolt action rifle which he had buried there. He then went to Kapusta's camp, where Kapusta and Cunningham were listening to the radio. Concealed by trees, defendant fired three shots at Cunningham from a distance of about 100 feet. One of these shots hit Cunningham in the head and he fell to the ground. Defendant then approached Cunningham, meanwhile firing three more shots, the last from a distance of about 5 feet. Four of the six shots entered Cunningham's body. At about the time he fired the last shot defendant said, "I don't care what I get. I knock him down. . . . He pulled a knife on me. That is why I shoot him down." Defendant then walked away.

Kapusta at once went to another camp and sent its occupant to report the shooting. Meanwhile, defendant hid in some weeds near a railroad until a freight train passed. He boarded the train and thus escaped. At some time during his escape he destroyed the rifle. During the next 14 months he migrated about California. As will hereinafter appear, he was then apprehended on a charge other than the killing of Cunningham and, while held in jail, volunteered a confession to the slaying.

Defendant does not challenge the sufficiency of the evidence to support his conviction but he does suggest that it is weak because the only two witnesses who described the shooting

---

[1]Pen. Code, § 1367: "A person cannot be tried, adjudged to punishment, or punished for a public offense, while he is insane."

Pen. Code, § 1368: "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined."

were Kapusta, who was nearly blind, and defendant himself, who was psychotic and a moron. There is nothing in the record which tends to raise a doubt as to the fact that defendant shot Cunningham; the only close questions concern his mental (and, therefore, his legal) responsibility.

Defendant took the stand. His testimony on direct examination is confused and contradictory. For example, he testified that he never owned a gun, then some minutes later testified that he bought a .22 rifle in Stockton and described the shooting in a manner substantially similar to that of his extrajudicial statements; he testified that he had never seen Kapusta before the trial, then some minutes later testified that Kapusta had been present at the time of the killing. According to counsel for both parties defendant was very slow and hesitant in his testimony. The effect of defendant's testimony in relation to the main issue was, of course, a matter to be determined by the jury.

On January 16, 1952, defendant was arrested in Sacramento. He was charged with escape from a county road camp (where he had been held under a vagrancy conviction) and on January 21 Mr. Orville Kline, assistant public defender, was appointed to represent him. Mr. Kline interviewed defendant on the 22d concerning the escape charge. On the morning of January 24, 1952, defendant wrote a note and addressed it "To Jailer." The note read in part, "I shot one man six times in jung*ile*." (The remainder of the note contained confessions of other homicides; the note was not shown to the jury and only the above quoted sentence of it was read to them.) Defendant gave the note to a deputy sheriff, who took it to the undersheriff. Defendant was at once taken from the jail to an office and questioned. Defendant admitted having written the note and when one of the deputies expressed skepticism as to its contents defendant said that he was telling the truth. Defendant was not threatened or promised immunity during the questioning. He was told that he need not talk unless he wanted to. The officers who questioned him did not know and did not ask whether he had an attorney and did not tell him that he was entitled to one. They did not tell him that anything he said could be used against him. He voluntarily described shooting a man, whose name he did not know, in the "American River Jungles," giving details which indicated that the crime to which he confessed was the killing of Cunningham.

On the afternoon of January 24, 1952, defendant, questioned by the district attorney, made a voluntary statement in which he described the killing of Cunningham. (Defendant also described his killing of a number of other migrants in other counties; these accounts were in accord with records of other actual, unsolved crimes; there was wide newspaper publicity as to the series of killings but at defendant's trial diligent effort appears to have been made by both prosecution and defense to keep from the jury any mention of homicides other than the one for which he was on trial.) The next day, at the request of the deputy sheriffs, defendant voluntarily directed them to the scene of the shooting and described to them where and how it took place.

On the morning of January 24, 1952, shortly after defendant had first confessed and while he was first being questioned as to the killing, his attorney, Mr. Kline, assistant public defender, came to the jail to see him in connection with the escape charge. Mr. Kline was informed by the undersheriff who had initiated the investigation into the truth of defendant's confession of homicide that defendant was being questioned by the district attorney. Mr. Kline did not see defendant at this time; the record does not show that he asked to see defendant relative to the homicide or his confession thereto, nor does it show when defendant first saw an attorney after his confession.[2]

On May 13, 1952, defendant, through counsel, moved to suspend the proceedings on the ground that he was so mentally deranged that he could not understand the nature and object of the proceedings against him and could not aid his counsel to conduct his defense in a rational manner. Defendant's

---

[2]The following matters concern the adequacy of defendant's representation by counsel and indicate the commendable care with which counsel for the People and the trial judge joined in protecting defendant's rights: The information charging defendant with homicide was filed on February 11, 1952, 18 days after defendant's first confession. At the preliminary hearing defendant was represented by Mr. Kistle, the public defender. On February 18, 1952, defendant appeared for arraignment; Mr. Kline, assistant public defender, was present; the court advised defendant of his rights to employ private counsel or to have the public defender appointed; defendant stated that he did not wish the services of the public defender but that he did not know how long it would take him to decide whether he wished to employ private counsel; the trial judge stated that he would not proceed in a capital case with defendant unrepresented, appointed Mr. Kline, and again advised defendant that he might, if able, make arrangements to employ other counsel.

On February 27, 1952, defendant, through Mr. Kline, moved for a change of venue. After hearing, the motion was denied. Defendant then pleaded not guilty and not guilty by reason of insanity, trial was set for

notice of motion was accompanied by affidavits to that effect made by Mr. Mannino and by a private psychiatrist who had examined defendant at Mr. Mannino's request. The judge read the affidavits and, without comment as to whether he did or did not have a doubt as to defendant's then existing sanity, permitted defendant's counsel to introduce testimony which tended to show defendant's inability to participate rationally in the preparation of his defense, and permitted the People to introduce testimony of two of the alienists whom the court (as required by section 1027 of the Penal Code) had appointed to investigate defendant's sanity upon his plea of not guilty by reason of insanity. The opinions of defendant's witnesses and those of the People's witnesses as to insanity affecting defendant's ability to participate in his own defense were in direct conflict.

During the cross-examination of one of the court-appointed alienists the trial judge said, ''If there is a doubt in your mind as to his ability to consult with his counsel in preparing a defense, if there is a defense, if there is any doubt in your mind at all I am going to give him a further hearing before a jury.'' The witness replied, ''I have no doubts in my mind.'' Similarly, during the cross-examination of the other alienist the judge asked whether the witness had ''any doubt at all'' as to defendant's sanity and received a negative reply. At the conclusion of the testimony defendant's counsel argued the facts and the law as to defendant's then sanity. The judge then said, ''I will read all those cases [cited in argument] again. . . . I want to give you every chance to be heard. . . . In the event the Court should express a doubt,

---

March 25, and the court appointed three psychiatrists to examine defendant.

On March 11, 1952, defendant, represented by Mr. Kline, who, as above mentioned, was assistant public defender, appeared in court. The district attorney pointed out that there had been a change in office the day before; that the public defender's office was now filled by a former deputy district attorney; and that the district attorney did not believe that it would be fair to defendant to require him to be represented by a former member of the prosecution, or a deputy working under him. The trial judge agreed that ''it would not be fair'' and stated that he had procured counsel, Mr. Peter Mannino, who had never been connected with the district attorney's office and who would be willing to represent defendant. After a private conference among defendant, Mr. Kline, and Mr. Mannino, defendant agreed to accept Mr. Mannino's representation and Mr. Kline was relieved. Trial was continued to April 29 to give Mr. Mannino opportunity to prepare the defense.

On May 13, 1952, Mr. C. K. Curtright, a private attorney, was associated with Mr. Mannino as counsel for defendant.

which I am not indicating that I have, I feel that the case should not have to go . . . to trial tomorrow morning. . . . Do not get any idea that I have any doubt in my mind, but I am going to read all these cases and I am going to go over the preliminary examination again. . . . I am deliberating very carefully on this matter, if I should determine that . . . there is a doubt and that should be tried, I will have that trial Friday, and if I should determine that I have no doubt, that there is not a doubt, the trial of the case in chief will have to go Friday.'' The judge took the matter under submission and stated that he would rule on it the next day (Wednesday). On Wednesday the judge ruled that ''The doubt referred to in section 1368 of the Penal Code does not exist in the mind of the Court.''

Defendant contends that ''The action of the trial court, in ordering an inquiry into the mental condition of the accused, based upon the affidavits of defendant's counsel and a psychiatric expert, is in and of itself evidence that a doubt as to the sanity of the defendant existed in the mind of the court within the meaning of Section 1368 of the Penal Code. It is true that the court stated after hearing the evidence . . . that the doubt contemplated did not exist in the court's mind but this does not obviate the necessary implication of the ordering of the inquiry in the first place.''

Defendant relies upon *People* v. *West* (1914), 25 Cal.App. 369, 372 [143 P. 793]; *People* v. *Vester* (1933), 135 Cal.App. 223, 228, 237 [26 P.2d 685]; and *People* v. *Jackson* (1951), 105 Cal.App.2d 811, 815 [234 P.2d 261]. In each of those cases it was held that the circumstances showed, as a matter of law, that the trial judge had or should have had a doubt as to defendant's sanity, and the cause was sent back for trial of the question as provided in sections 1368 and 1369 of the Penal Code.

The ''doubt'' referred to in section 1368 is a doubt in the mind of the trial judge, and ''The sanity contemplated by the code section is tested by appraising the present ability of the defendant to so understand the nature and purpose of the proceedings taken against him as to be able to conduct his own defense in a rational manner. [Citations.] A strong showing is required before an abuse of discretion is deemed to result from the failure of the trial court to order a determination of present sanity. . . . However, when a doubt of the defendant's sanity at the time of the trial as contemplated by the statute appears on the face of the record

as a matter of law, an abuse of discretion is shown and the failure to order a determination of the question of sanity results in a miscarriage of justice and a reversal is required. [Citations.]'' (*People* v. *Aparicio* (1952), 38 Cal.2d 565, 567-568 [241 P.2d 221].)

The circumstances of the hearing on the motion to suspend the criminal prosecution for the purpose of trying the issue of this defendant's then sanity do not establish that the trial judge had a doubt of defendant's sanity, nor does the record of the proceedings on that motion and the subsequent developments during the trial conclusively show that he should have had such a doubt. ■ The determination of the motion ''rests within the sound discretion of the [trial] court. Necessarily, an appellate court cannot measure to a nicety the basis for the ruling, and the trial judge must always be allowed a wide latitude.'' *People* v. *Lindley* (1945), 26 Cal.2d 780, 789 [161 P.2d 227].) ■ This is a latitude, however, within which the trial judge himself should never speculate on a nicety of balance; he necessarily is either certain or in doubt. And if he is not certain he must remember that in that circumstance the law is certain; it accords the defendant the right to a trial by jury. ■ But, as previously indicated, the record does not show that the trial judge here indulged in speculation; rather, it shows that having no doubt of defendant's sanity he, nevertheless, conscientiously permitted the defendant to try to arouse such a doubt, considered whether in the light of the evidence he should have such a doubt, and determined in the exercise of his sound discretion that he should not. ■ Nor does the fact that the trial judge asked the alienists whether *they* had a doubt of defendant's sanity indicate that he was applying an improper test of whose the doubt must be, for the judge repeatedly stated that *he* had no such doubt; rather, his questions and comments seem to indicate a willingness to acquire a doubt if a basis therefor, which appeared substantial to him, were established.

■ Prior to entry of his pleas, defendant moved for a change of venue on the ground that extensive, adverse newspaper publicity concerning defendant, particularly concerning his confession to a large number of homicides, would make it impossible to select an impartial jury. The motion was denied without prejudice. *Voir dire* examination of the jury panel disclosed that many of the prospective jurors had read of the case. Those who were accepted as jurors, and

many of those who were not, said that their reading had left no impression on them which would require evidence to overcome. After a jury of 12 and one alternate had been selected, defendant through his diligent counsel renewed his motion for change of venue. He put in the record articles from Sacramento newspapers published during the period of time from January 25, 1952 (the day after defendant made his initial confession in the county jail), through May 20, 1952 (the day before the making of the renewed motion). The articles described nine killings to which defendant had confessed, stated that defendant "has admittedly slain '12 or 15 guys,'" detailed his police record, and covered completely the proceedings against him. These articles were factual and disclosed no bias against defendant on the part of the newspapers, the community in general, or the prosecution. One article characterized the jury panel as "prosecution-minded" because several prospective jurors were excused after they said they had formed an opinion as to defendant's guilt. However, as previously indicated, a jury was found which was composed of persons who had not read or did not remember reading the articles or who were not particularly impressed by them. It may also be noted that defendant's victims were persons not known to the community. (Cf. *People* v. *McKay* (1951), 37 Cal.2d 792 [236 P.2d 145].)

On May 25, 1952, during the course of the trial, there was published another newspaper statement which defendant claims prejudiced him and which was promptly called to the trial court's attention as a ground for mistrial. The newspaper attributed to a deputy district attorney (not connected with the prosecution of this case) the statement that an attempt of defendant to escape from the courtroom "was the best advice Counsel could have given him," and characterized this remark as "the most amusing comment of the week." There is no evidence whatsoever that defendant's counsel gave him any such advice. On May 29, 1952, there appeared another newspaper publication which caused defendant to renew his motion for mistrial. It purported to be an account of the previous day's hearing, was entitled "Gomez Grins as he Tells of Jungle Death," and accompanied photographs of defendant captioned "Courtroom Pictures." The article referred to medical testimony that defendant had apparently enjoyed killing, said that he smiled as he testified to shooting Cunningham, and stated that the district attorney had said, "Even in memory it brings a smile to his lips." Actually

the pictures had not been taken in the courtroom and no such remark had been made in the courtroom. (There is no evidence as to whether any such remark was or was not made elsewhere.) Whether the inaccuracies of such representations were products of deliberate dishonesty or of the negligence of some person or persons connected with their publication, does not specifically appear and on this appeal is not material. Neither does it appear nor is it controlling here whether contempt proceedings were instituted or whether there was prompt retraction of the untrue statement and implications. The publication of such inaccurate representations during a trial, whether from motive or carelessness, is indefensible; obviously it does not serve the cause of justice or of civilization. And it is conceivable that even accurate publications during or preceding a trial may effect a breach of due process. (See concurring opinion of Mr. Justice Jackson, joined by Mr. Justice Frankfurter, in *Shepherd* v. *Florida* (1951), 341 U.S. 50, 51 et seq. [71 S.Ct. 549, 95 L.Ed. 740] ; see, also, dissenting opinion of Mr. Justice Frankfurter in *Stroble* v. *California* (1952), 343 U.S. 181, 198 et seq. [72 S.Ct. 599, 96 L.Ed. 872].) The fact that the publications here concerned a penniless psychotic moron who was a killer and on trial for his life tends not at all to ameliorate their vice. This man had as much right to a fair and honest trial —to be adjudged on the facts and law as adduced and stated in the courtroom, free from the emotional sway of published vilification—as any citizen of the land. But whether such inaccurate (or other) publications warrant a reversal of the judgment of conviction depends on whether the defendant's rights have been prejudiced.

It is defendant's position that the jurors could not have avoided being influenced by these publications (both the accurate and the inaccurate) even though the trial judge had admonished them that they were not to read of, discuss, or listen to discussion of the case. But to sustain such contention we should have to draw inferences contrary to those drawn by the trial court, and on the showing here no such contrary inferences by us appear justified. As already indicated this is not a case in which a prosecutor stooped to misconduct or in which a trial judge or defense counsel showed any laxity in discharge of duty. On the contrary, trial judge, district attorney and defense counsel united in conducting the trial on a standard so high and clean as to merit express

commendation. All counsel were consistently alert. The trial judge's admonitions were repeated, vigorous, and in varied and appropriate terms, rather than the mere recital of a formula. Presumably the jurors heeded these admonitions and, upon the entire record, we cannot hold that because of the publications mentioned the defendant was deprived of a fair trial.

During *voir dire* examination of prospective jurors, after some of the jurors had been chosen, defendant attempted to escape. This attempt created considerable confusion in the courtroom. An unidentified woman loudly said, "I knew he was going to do it all the time." The bailiff who had charge of defendant drew his revolver as he left the courtroom to recapture defendant. Defendant's counsel made timely motions to discharge the jury panel because of this incident. He contends that the jurors may well have been unconsciously prejudiced by it, even though on subsequent *voir dire* examination they declared that they were not. Defendant relies upon cases where the conduct of spectators in the courtroom was so likely to have prejudiced the jurors or made them aware of community feeling against the defendant that a reversal was necessary. Those cases are not in point. Here it was defendant himself who precipitated the courtroom disturbance and the doctrine of invited error applies.

As stated in *People* v. *Stroble* (1951), 36 Cal.2d 615, 621 [226 P.2d 330], "where, as here, the defendant has been represented by able and experienced counsel, the evidence of guilt is ample, and the presentation of the case in court . . . is fair, we should not reverse because of mere speculation that the jury might unconsciously have been improperly influenced adversely to defendant in the performance of their duties."

Defendant contends that the trial court erred by admitting evidence of his confessions and extrajudicial statements without a showing that they were voluntary. In this defendant is mistaken. As previously indicated, the officials to whom the statements were made testified before the trial judge and jury that no threats, abuse, or promises of reward were used. The trial court ruled that it was satisfied that a showing that the statements were voluntary had been made. A psychiatrist then testified for defendant as to defendant's mental inadequacy, which affected the weight to be given his statements (*People* v. *Boyington* (1935), 3 Cal.App.2d

655, 657 [39 P.2d 867]), and Mr. Kline testified that when he went to jail to interview defendant in connection with the escape charge he was informed that the district attorney was questioning defendant. (As previously stated, Mr. Kline was not then taken to see defendant, and there is no showing that he then asked to see defendant.) The trial court properly admitted evidence of the content or substance of the statements and submitted the question of their voluntariness to the jury under correct instructions. (*People* v. *Sourisseau* (1944), 62 Cal.App.2d 917 [145 P.2d 916].)

Defendant calls attention to evidence that at the time defendant wrote the note he was confined in a room with a number of other prisoners, that defendant does not like the company of other persons, and that his motive in writing the note was a desire to be taken from the room. The effect of this circumstance on the weight to be given the note was for the jury.

Defendant asserts that he was prejudiced by testimony relating to other offenses. The trial court, counsel for both sides, and the officers and physicians who testified all apparently made careful efforts not to mention defendant's other homicides before the jury. Nevertheless, the following references to the other crimes were made:

The undersheriff who questioned defendant immediately after defendant wrote the note which constituted his original confession was asked what was said concerning the note. In relating his conversation with defendant he said in part, ''I then directed his attention to one place there where one looked like a six, and I said, 'Do you mean to tell me you killed six men in Merced?' and he said, 'No, that is a mistake, that means one.' Now, I think you will note there on the——'' The district attorney interrupted the witness by saying ''I just want what was said.'' There was no objection and no further reference to any killing in Merced was made.

On the People's redirect examination of one of the deputies who questioned defendant immediately after he had first confessed, the following took place:

''Q. Mr. Louderback, in this four or five hours of questioning, was that all in regard to this one particular case? A. No, it was regarding twelve or fifteen cases.

''Q. And that is what took all this——

''MR. CURTRIGHT [defendant's counsel]: Move that be stricken.

"THE COURT: It may go out. It was not responsive. You asked him if it was all in regard to this case and all he would have to say is 'No.'

"MR. O'SHEA [district attorney]: Q. The answer is No? Was it in regard to more cases than this—I withdraw that.

"MR. MANNINO [defendant's counsel]: Again.

"MR. CURTRIGHT: We object.

"MR. O'SHEA: Q. Was it in regard to other matters?

"MR. CURTRIGHT: We assign that as prejudicial——

"THE COURT: (Interposing) The Jury is instructed to disregard it.

"MR. O'SHEA: Q. Did you have a conversation with him in regard to other matters in addition to this particular killing out here in the jungle?

"THE COURT: Answer is yes or no. A. Yes.

"Q. And was there more than one of those other matters? A. Yes.

"MR. O'SHEA: That is all."

While the district attorney was cross-examining one of defendant's experts on the issue whether defendant was capable of having "an abandoned and malignant heart," he asked, "Suppose this isn't the only killing he has done——" Defendant's counsel interposed a prompt objection and the court instructed the jury to disregard the question.

The above incidents appear to have been inadvertent on the part of counsel for the People and relatively so trifling in relation to any close issue of fact that defendant could not have been prejudiced by them.

■■■ Finally, defendant complains of the trial court's giving of certain instructions, and its refusal to give other instructions, "regarding the consideration to be given evidence of defendant's mental condition, as the same related to the factual questions of malice and deliberation as elements of the crime charged." Defendant does not direct attention to the instructions which he claims were erroneously given and refused. The entire charge to the jury, including the portion of it which dealt with defendant's mental state, was eminently fair. The degrees of murder and the meaning of malice aforethought and of deliberation and premeditation were explained to the jury. They were also told that because of an abnormal mental condition a person "might be less likely or unable to have or to hold a specific intent or a certain state of mind, which is an essential ingredient of a certain

crime''; and more specific instructions[3] directed their attention to the relation between the evidence as to defendant's mental condition and the qualities of malice aforethought, deliberation, and premeditation. There was no error against defendant in such instructions. There is no refused instruction which presents adequately and correctly to the jury the problems of the relation of defendant's mental condition to the mental state requisite to the crime of murder of the first degree.

For the reasons above stated, the judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.

---

[3] ''We have received evidence bearing on the mental and nervous condition of the defendant at the time of the alleged commission of the crime charged. Such evidence may be considered by you in determining whether or not defendant did the overt act charged against him and, if so, whether or not, at that time, there existed in him the specific mental factor which, as you have been instructed, must accompany that act to constitute a certain crime or degree of crime. . . .

''If, upon your consideration of all of the evidence in the case, you cannot say that you are convinced to a moral certainty and beyond a reasonable doubt that the defendant had and held malice aforethought, whether that reasonable doubt arises by reason of defendant's mental abnormality or incapacity, or otherwise, you may not find the defendant guilty of murder.

''And if, upon your consideration of all of the evidence in the case, you cannot say that you are convinced to a moral certainty and beyond a reasonable doubt that the killing was deliberate and premeditated, whether that reasonable doubt arises by reason of defendant's mental abnormality or incapacity, or otherwise, you may not find the defendant guilty of murder in the first degree.''