[Crim. No. 6403. In Bank. Sept. 16, 1959.]

THE PEOPLE, Respondent, v. JAMES MERKOURIS, Appellant.

Ellery E. Cuff, Public Defender (Los Angeles), Richard B. Goethals, John A. Tolmasov and Richard W. Erskine, Deputy Public Defenders and Morris Lavine for Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

McCOMB, J.—Defendant was found guilty on two counts of first degree murder, and the jury fixed the penalty as death. His appeal is automatic, pursuant to section 1239, subdivision (b), of the Penal Code.[1]

On November 15, 1954, two informations were filed against defendant by the district attorney of Los Angeles County, charging him with having murdered Despine Forbes and Robert P. Forbes on or about September 20, 1954. Defendant pleaded not guilty to the charge of having murdered Despine Forbes, and his counsel entered an additional plea, with respect to such charge, of not guilty by reason of insanity.

After a jury trial on the charge of having murdered Despine Forbes, defendant was convicted of first degree murder, and the death penalty was imposed.

Defendant personally withdrew his plea of not guilty by

---

[1]Section 1239, subdivision (b), of the Penal Code reads: "When upon any plea a judgment of death is rendered, an appeal is automatically taken by the defendant without any action by him or his counsel."

reason of insanity. After an automatic appeal, the judgment was reversed and remanded for a new trial. (*People* v. *Merkouris,* 46 Cal.2d 540 [297 P.2d 999].)

The plea of not guilty by reason of insanity was reinstated, and the trial court declared it had a doubt as to defendant's present sanity. After trial before a jury, defendant was found presently insane, and on September 13, 1956, was committed to the state hospital at Atascadero.

In August 1957 a certificate was issued by the acting superintendent and medical director of the state hospital at Atascadero stating that defendant was sane, and he was ordered returned from the hospital to Los Angeles for retrial, the trial date being subsequently set as June 16, 1958. Defendant's counsel on August 26, 1957, and again on June 16, 1958, requested the trial court to declare that it entertained a "doubt" as to defendant's then sanity, pursuant to the provisions of section 1368 of the Penal Code.[2] On August 26, 1957, the court appointed two psychiatrists to examine defendant and, after taking considerable evidence, found on June 19, 1958, that it did not entertain a "doubt" within the meaning of the statute as to defendant's then sanity. The court then ordered that the two informations be consolidated and the case proceed to trial. Both sides stipulated that defendant be deemed to have pleaded not guilty and not guilty by reason of insanity with respect to the charge of having murdered Robert P. Forbes. After trial, the jury returned two verdicts of guilty of first degree murder, and then fixed the penalty as death. ·

A jury trial was waived on the plea of not guilty by reason of insanity. After a 10-day trial on this issue the court, on conflicting evidence, found that defendant was sane at the time of the commission of the two offenses. A defense motion to declare a doubt as to defendant's then present sanity and motion for a new trial were denied, and defendant was sentenced to death, with the resulting present automatic appeal.

These questions are presented for determination:

---

[2]Section 1368 of the Penal Code reads: "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined, and the trial jury in the criminal prosecution may be discharged, or retained, according to the discretion of the court until the determination of the issue of insanity."

First. *Was there substantial evidence to sustain the judgments of guilty?*

*Yes.* The evidence is fully summarized in the prior opinion (*People* v. *Merkouris, supra,* p. 543 et seq.). Since the evidence on the present trial, so far as the merits are concerned, is substantially the same as that previously produced, no useful purpose would be served by setting it forth herein.

From a résumé of the evidence set forth in the prior opinion, it appears that at the time the case was submitted to the jury reasonable inferences of defendant's guilt or innocence could have been drawn therefrom. ■ Therefore, the rule set forth in *People* v. *Newland,* 15 Cal.2d 678, 680 [1] [104 P.2d 778], is applicable, that is: In a criminal prosecution the weight of the evidence is for the jury to determine, and if the circumstances reasonably justify a verdict of guilty by the jury, an opinion of the reviewing court that those circumstances might also be reasonably reconciled with the innocence of the defendant does not warrant a reversal of a verdict of guilty by the jury. ■ Likewise, defendant's contention that the incriminating circumstantial evidence was insufficient to establish his guilt because such evidence might also be deemed compatible with innocence is not well taken. (*People* v. *Newland, supra,* p. 684 [2].)

Second. *Did the trial court err in not holding as a matter of law that it entertained a "doubt" as to defendant's present sanity at the time of the trial?*

*No.* These rules are here applicable:

■ i. A defendant is sane, within the meaning of section 1368 of the Penal Code, if he is able to understand the nature and purpose of the proceedings taken against him and to conduct his own defense in a rational manner. (*People* v. *Jensen,* 43 Cal.2d 572, 576 [1] [275 P.2d 25]; *People* v. *Aparicio,* 38 Cal.2d 565, 567 [1] [241 P.2d 221].)

■ ii. The "doubt" referred to in section 1368 of the Penal Code, requiring a determination of a defendant's sanity if doubt arises during the pendency of the action or prior to judgment, is doubt in the mind of the trial judge, rather than in the mind of counsel for the defendant or any third person. (*People* v. *Jensen, supra,* p. 576 [2].)

■ iii. The determination of a motion for a hearing upon the issue of a defendant's sanity at the time of trial is one which rests within the sound discretion of the trial court. (*People* v. *Lindley,* 26 Cal.2d 780, 789 [3] [161 P.2d 227]; *People* v. *Gomez,* 41 Cal.2d 150, 159 [5], [6] [258 P.2d 825].)

It is only where as a matter of law a "doubt" may be said to appear or where there has been an abuse of the discretion that is vested in the trial judge, in the determination of the question, that the conclusion of the latter may properly be disturbed on appeal. (*People* v. *Jensen, supra*, p. 576 [3].)

Applying the foregoing rules to the facts of the present case, it appears that on August 26, 1957, when defendant's then counsel (Mr. P. Basil Lambros) requested the court to declare a doubt as to defendant's sanity, the trial court had before it the following matters bearing on that question: Statements of Mr. Lambros describing defendant's conduct when he visited defendant in the county jail after defendant's return from Atascadero; statement of Mr. Lambros that defendant's "contention has always been one of sanity, and in my opinion he merely convinced the doctors at Atascadero that he was sane by telling them he was sane, because I checked with Atascadero, and I found that never once, in one of the staff meetings, did he ever open his mouth. They never had one psychiatric conference with him. Now, the only basis for certifying him back as sane is the fact that he had talked with various ward doctors and with the inmates in his room"; Mr. Lambros' stated opinion that defendant was not capable of consulting with an attorney to prepare and conduct his defense; defendant's conduct in the court-room; the report and certificate of Atascadero officials that defendant was presently sane and a letter to the district attorney from Atascadero officials stating the observations of the physician who had charge of the ward where defendant had been confined and the conclusions of the staff doctors; and the deputy district attorney's stated opinion that defendant behaved as he did in the jail and the courtroom because "he just does not care to go to trial."

With the foregoing matters before him, the trial judge was justified in concluding on August 26, 1957, as he did, that the Atascadero report was "more persuasive than any outward manifestation as indicated by the conduct of the defendant before the court, from which the court cannot conclude at this time that it entertains a doubt as to the present sanity."

An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper. Conduct of the character indicated by the record here may, to the observant trial judge, be overwhelmingly suggestive of a calculated attempt at cunning

deception rather than of mental weakness. It may well operate to preclude the rational entertainment of any doubt as to the actor-defendant's sanity.

The trial court's appointment (under section 1871 of the Code of Civil Procedure) of two psychiatrists to examine defendant and report to the court, and its continuance of the matter, do not indicate that the court had a doubt as to defendant's sanity. The continuance was granted on motion of defense counsel, expressly not opposed by counsel for the People, because both counsel had lengthy litigation in another matter. The experts were appointed at the request of counsel for both parties, so that a later report on defendant's condition would be available when counsel were free to go to trial in this case.

On June 16, 1958, after continuances for various reasons, defendant, represented by the public defender, appeared for trial. The deputy district attorney, rather than defense counsel, first raised the question of defendant's sanity. The prosecutor said that Mr. Lambros, while he was still representing defendant, had informed the court (at an earlier appearance before another judge) that Dr. Frederick J. Hacker (who had been of the opinion in August 1956 that there was a question of defendant's ability to cooperate in his own defense) had thoroughly examined defendant and concluded that he was presently sane but that defendant "claimed he had *petit mals* and that would prevent him from being present [i.e., aware of the proceedings] at stages of the trial under the not guilty issue." Therefore, the prosecutor said, "In order to arm the Court with any material that might be necessary to determine that issue during this trial as well as the defendant's present status as to present sanity, I wish to submit to the Court copies of [a report of Dr. Marcus Crahan, medical doctor for the Los Angeles sheriffs' facilities, a psychiatrist who had re-examined defendant on June 11, 1958]," and "some personal testimony from Dr. Crahan."

Defense counsel stated that he was raising the question of defendant's then existing sanity and presented reports of recent psychiatric examinations of defendant. The prosecutor said, "to fortify the record . . . I want to crossexamine these doctors" and present other psychiatric evidence.

On June 17, 1958, defendant and respective counsel again appeared. The court announced that "This proceeding is had at the suggestion of counsel for the defendant . . . as to whether or not this Court should entertain a doubt as

to the present sanity." Defendant at his request was allowed to make a statement, in which he insisted that he was not, and never had been, insane, did not wish to enter an insanity plea, and if such a plea had been entered, he wished it withdrawn. Defendant's remarks concerning his sanity were in substance similar to those which he had made when he was allowed to withdraw his insanity plea at the original trial. It was for the trial court to evaluate defendant's renewal of his insistence upon his sanity, in the different circumstances presented in 1958, as relating to the question whether the court had a doubt as to his existing sanity. In this connection the court was entitled to consider that defendant's similar statement in 1955 was one of the factors which led to a reversal of the prior conviction and the ensuing delay in these proceedings. Although defendant reportedly had told physicians and his counsel that he wished a prompt disposition of the cause, the court may (and is to be presumed to) have determined that defendant, having once observed the effect of such a statement in delaying the ultimate decision of these proceedings, formed the opinion that repetition of his previously announced position might have a similar dilatory effect.

The trial judge, upon all the evidence as to defendant's existing sanity, including the opinion of four psychiatrists who had testified that defendant was presently sane, several of them stating that they believed he was simulating insanity, epilepsy, or some neurological disease, could properly disbelieve completely the opinions that defendant was incapable of cooperating in his defense.

The foregoing demonstrates that the evidence on the subject of defendant's sanity was highly conflicting and, together with the trial judge's personal observation of defendant, was sufficient to support his conclusion that he did not have a doubt as to defendant's sanity at that time.

Third. *Did the trial court err in receiving in evidence, (a) over defendant's objection, statements made by the deceased, Despine and Robert Forbes, through the testimony of Mr. and Mrs. Fairly and Officer Bonk, (b) over defendant's objection, testimony of Inspector Wood relative to an indictment of defendant for sending threatening letters through the mail, and (c) without objection, the testimony of Officer Kline, a rebuttal witness for the People, relative to the belief of defendant's brother, Reverend John Merkouris, who was*

*not a witness, that if defendant was accused of killing anyone, it would be Despine Forbes, defendant's ex-wife?*

No. ▮▮▮ (a) The testimony of Mr. and Mrs. Fairly and Officer Bonk, of which defendant complains, was to the effect that in August 1948 Despine and Robert Forbes expressed to Mr. and Mrs. Fairly their intent to stay with them awhile because defendant had threatened their lives, and that in 1949 or 1950 Robert Forbes expressed to Officer Bonk his intention to obtain a permit to carry a gun because defendant had been bothering the Forbeses again. This testimony was objected to on the ground that it was immaterial, hearsay, remote, and prejudicial. In overruling the objection, the judge admonished the jury that the evidence was being received for the limited purpose of showing the declaration of intent of the deceased persons and their state of mind and not as to the truth of the statements alleged to have been made.

Inspector Wood testified to his having received a complaint in the late summer of 1948 relative to a violation of postal regulations; to his having talked with Robert and Despine Forbes; and to his having procured, through Robert Forbes, letters of a malicious and threatening nature sent by defendant. He also testified to his having talked with Robert Forbes again in 1950 and Mr. Forbes' complaining about defendant. An objection on the ground that the evidence was remote, immaterial, and hearsay was overruled.

The trial court's rulings were correct. The victims' assertions of intent to avoid and protect themselves from defendant were admissible under the mental state exception to the hearsay rule as evidence that in fact they had such intent. The existence of that intent evidences the declarants' fear of defendant.

▮▮▮ The declarations that defendant had threatened the victims were admissible, not to prove the truth of that fact directly, but to prove the victims' fear.

▮▮▮ Where, as here, the identification of defendant as the killer is in issue, the fact that the victims feared defendant is relevant because it is some evidence that they had reason to fear him, that is, that there is a probability that the fear had been aroused by the victims' knowledge of the conduct of defendant indicating his intent to harm them rather than, e.g., that the victims' fear was paranoid. (*Karnes* v. *Commonwealth*, 125 Va. 758 [99 S.E. 562, 564 [4] et seq., 4 A.L.R. 1509]; *Lowery* v. *State*, 87 Okla. Crim. 313 [197

P.2d 637, 651 [14, 15]]; *State* v. *Bauers,* 25 Wn.2d 825 [172 P.2d 279, 286-287 [8]-[9]].)

 (b) Inspector Wood testified, over objection, to what was encompassed by the indictment against defendant for sending threatening letters through the mail. He testified that under the federal statute, as he knew it, the language of the indictment which he secured from the federal grand jury encompassed not only obscenity in the letters but also, in effect, threats, although it did not mention threats specifically. Defendant contends that this evidence was inadmissible.

It is an admitted fact that defendant pleaded guilty to the indictment charging him with sending obscene matter through the mails, was fined $150, and placed on probation for two years. (*People* v. *Merkouris, supra,* p. 544.) Also, the record discloses that there was before the jury proper evidence that the letters sent by defendant did in fact contain threats as well as obscenity.

Assuming, without deciding, that the questioned evidence of Inspector Wood was inadmissible, we are satisfied from an examination of the entire record that such evidence was not sufficiently important to prejudice defendant in the eyes of the jury and result in a miscarriage of justice. Therefore, under article VI, section 4½, of the California Constitution, the alleged error does not warrant a reversal of the judgment.

(c) As a defense witness testifying through an interpreter, Reverend Michael Merkouris corroborated defendant's alibi in a vital particular, to wit, that defendant contacted him in Galveston September 19, 1954. Reverend Michael denied meeting Officer Kline September 23, 1954, or talking with such an individual in the presence of Reverend John, or knowing whether John had a conversation with Kline, or whether John stated to Kline that neither John nor Reverend Michael had seen or heard of defendant after the latter left Galveston about a month prior to September 23, 1954. He also testified that his understanding of, and ability to speak, English was limited.

Officer Kline, called as a rebuttal witness, testified to the effect that he did have a meeting and did talk with Reverend Michael on September 23, 1954; that they spoke to one another in English; that Reverend Michael called Reverend John over, and the two of them stood right next to each other; that in the ensuing conversation Officer Kline told of defendant's being wanted for murder in Los Angeles; and that Reverend John said defendant had left Galveston a month

previously and neither he nor Reverend Michael had seen or heard from him since. He gave other testimony which tended to show that Reverend Michael knew what was being said, that is, that while Officer Kline was telling of defendant's being wanted for murder, Reverend Michael said, "Oh, my God!" more than once, and one such instance was when Reverend John said, "My God, was it his ex-wife?" Defendant now objects to the court's having received in evidence the portion of the testimony containing Reverend John's query whether it was defendant's ex-wife. Since no objection was made in the trial court to the receipt of this testimony, defendant may not now urge that it was error to receive it. (*People* v. *Owens*, 123 Cal. 482, 490 [56 P. 251]; *People* v. *Lindsey*, 90 Cal.App.2d 558, 567 [16] [203 P.2d 572]; *People* v. *Sellas*, 114 Cal.App. 367, 378 [300 P. 150].)

 Fourth. *Did the deputy district attorney improperly argue to the jury when he injected his opinion that defendant was a liar, basing his opinion on a previous trial, with which the jury was not familiar?*

*No.* The deputy district attorney in his argument to the jury said he wished he had the same opportunity to demonstrate in the case at bar the manner in which he had been able to impeach defendant at the former trial. There was an objection, which the court sustained on the ground that what was in the former trial was not evidence in the case at bar. The deputy district attorney then explained that he was referring only to evidence which had been read into the record and was evidence in the case at bar. Thereupon the court said that counsel had a right to refer to evidence in the case at bar. The deputy district attorney then explained that he had particular reference to that testimony from the former trial which was read into the record in the present case, and to stipulations in the present case pertaining to proceedings at the former trial, disclosing that defendant did not know, when he was being cross-examined at the former trial, of a recording of his conversation with Sergeant Jones in which defendant had said that he had not been in Los Angeles for seven or eight years. Counsel remarked, in this connection, that he wished he "had that same opportunity to do it that way today" and referred to defendant as having falsified.

The portions of defendant's testimony from the former trial read into the record in the present case included an acknowledgment by defendant that he had been in Los Angeles between September 3 and September 8, 1954, followed by the

playing of a recording, of which defendant had been unaware and which disclosed his having told Sergeant Jones on September 27, 1954, that he had not been in Los Angeles for seven or eight years.

In effect, the deputy district attorney was reminding the jurors of the evidence from the former trial read into the record in the present trial and reflecting that defendant had been impeached, in that he had made false statements. The remarks did not constitute a departure from the record. In addition, the court apprised the jurors that the statements of counsel were not evidence. Therefore, it will be assumed that the jurors properly regarded the remarks as a matter of argument. (*Cf. People* v. *Chavez,* 50 Cal.2d 778, 792 [20] et seq. [327 P.2d 907].)

 Fifth. *Is section 190.1 of the Penal Code unconstitutional?*

*No.* Defendant contends that the provisions of section 190.1 of the Penal Code[3] are ex post facto as to him, in that

---

[3]Section 190.1 of the Penal Code reads: "The guilt or innocence of every person charged with an offense for which the penalty is in the alternative death or imprisonment for life shall first be determined, without a finding as to penalty. If such person has been found guilty of an offense punishable by life imprisonment or death, there shall thereupon be further proceedings on the issue of penalty, and the trier of fact shall fix the penalty. Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty. The determination of the penalty of life imprisonment or death shall be in the discretion of the court or jury trying the issue of fact on the evidence presented, and the penalty fixed shall be expressly stated in the decision or verdict. The death penalty shall not be imposed, however, upon any person who was under the age of 18 years at the time of the commission of the crime. The burden of proof as to the age of said person shall be upon the defendant.

"If the defendant has pleaded not guilty by reason of insanity at the time of the commission of the offense, the trier of fact, after the determination of the penalty, shall thereupon determine whether or not defendant was sane at the time of commission of such offense. The provisions of this section shall prevail over any other provision of law with respect to the time of determining the sanity of defendant at the time of commission of the offense. However, if at any time during the trial of defendant, doubt arises as to the sanity of defendant at such time, the question of defendant's sanity shall be determined as provided in Chapter 6 (commencing at Section 1367) of Title 10, Part 2 of this code.

"If the defendant was convicted by the court sitting without a jury, the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived. If the defendant was convicted by a jury, the trier of fact on the issue of penalty and the issue of sanity, if any, shall be the same jury unless, for good cause shown, the court discharges that jury

the crimes which he committed occurred prior to the effective date of this section. This contention has been held to be without merit. (See *People* v. *Turville*, 51 Cal.2d 620, 636 [22] et seq. [335 P.2d 678] ; *People* v. *Feldkamp*, 51 Cal.2d 237, 241 [1] [331 P.2d 632] ; *People* v. *Ward*, 50 Cal.2d 702, 710 [4] et seq. [328 P.2d 777].)

 Sixth. *Did the trial court err in the penalty proceedings in receiving the testimony of Drs. Crahan and McNiel?*

*No.* In the penalty proceedings the defense presented a stipulation with respect to defendant's having been found presently insane by a jury, within the meaning of section 1368 of the Penal Code, after a trial in August and September 1956, and his having been committed to Atascadero State Hospital for care and treatment pursuant to that section. After the defense rested, the People proceeded with rebuttal.

Dr. Crahan, a rebuttal witness, testified that on the basis of his examinations of defendant and the materials furnished him, he was of the opinion that defendant was presently sane during the aforementioned sanity trial; that defendant had been presently sane at all times under the doctor's examination; and that defendant had been malingering before the jury during the present sanity trial. Dr. McNiel testified similarly.

This testimony defendant contends was improper, on the theory that the jury having found defendant insane, the matter was res judicata. It was not res judicata, and the testimony was properly received, since an order of commitment to a state hospital for the insane does not conclusively establish that the person committed is insane; it merely creates a presumption that the person is insane and that the insanity continues. However, the presumption is rebuttable. (*People* v. *Superior Court*, 4 Cal.2d 136, 145 [7] et seq. [47 P.2d 724] ; *People* v. *Gilberg*, 197 Cal. 306, 319 [8] et seq. [240 P. 1000] ;

in which case a new jury shall be drawn to determine the issue of penalty, or the issue of sanity or both such issues, as the case may be.

"On such further proceedings on the issue of penalty, any evidence concerning the commission of the crime admissible in the trial determining the guilt of the defendant may be admitted.

"In any case in which defendant has been found guilty by a jury, and the same or another jury, trying the issue of penalty, is unable to reach a unanimous verdict on the issue of penalty, the court shall dismiss the jury and either impose the punishment for life in lieu of ordering a new trial on the issue of penalty, or order a new jury impaneled to try the issue of penalty, and the issue of sanity, if any, but the issue of guilt shall not be retried by such jury.''

*People* v. *Field,* 108 Cal.App.2d 496, 500 [8] et seq. [238 P.2d 1052].)

The judgment is affirmed.

Schauer, J., Spence, J., and White, J., concurred.

PETERS, J.—I dissent.

In my opinion, under all the facts, many of which are not fully or at all set forth in the majority opinion, a "doubt" as to defendant's present sanity existed as a matter of law, and failure to declare such "doubt" constituted prejudicial error requiring a reversal. The majority opinion does not disclose that on the prior appeal in this case (*People* v. *Merkouris,* 46 Cal.2d 540 [297 P.2d 999]), the main ground of the reversal was that a "doubt" as to defendant's then sanity existed as a matter of law, and that the evidence on that issue there involved was much weaker than the evidence on the same issue on the present appeal. Nor does the majority opinion disclose that on the lengthy hearing to ascertain whether a "doubt" as to present sanity existed, the trial judge was confused and at times expressed the thought that the issue then before him was whether defendant was or was not sane. That, of course, was not the issue. The opinion now signed by a majority of this court indicates on its face that the majority are also laboring under the same misapprehension. This is indicated by several statements appearing in that opinion. On page 10 of the typewritten opinion appears the statement: "The trial judge, upon all the evidence as to defendant's existing sanity . . ." And on the next page appears: "The foregoing demonstrates that the evidence on the subject of defendant's sanity was highly conflicting . . ." That was not the issue before the trial court, nor the issue before this court.

Because of the failure of the majority opinion to set forth all of the pertinent facts, those facts will be set forth in some detail.

The first reversal in this case is dated May 25, 1956. In August of 1956, the trial court, as directed by this court, declared a "doubt" of the present sanity of defendant under section 1368 of the Penal Code.[1] On September 13, 1956, a

---

[1] Section 1368 provides, in part: "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded . . ."

jury decided that defendant was presently insane, and he was committed to Atascadero. On August 13, 1957, the proper officials of that hospital certified that, in their opinion, defendant was presently sane. On August 26, 1957, defense counsel requested the court to declare a "doubt" as to the present sanity of defendant. At the commencement of this hearing, the defendant, evidently laboring under the misapprehension that he had been brought from Atascadero to see a Dr. Jacobs, one of his doctors at Atascadero, demanded to see that doctor. He grew violent, and the record shows: "The defendant is removed from the courtroom." The former attorney for defendant, Mr. Lambros, at the court's request, made a statement in support of his motion for the court to declare a doubt as to defendant's then sanity. Lambros stated that on three occasions he had visited defendant at Atascadero, that "on no occasion have I, in my opinion, been able to get through to him"; that in these attempted interviews defendant would confuse Lambros with Dr. Jacobs, his ward doctor, and would ask for Dr. Jacobs or for a Dr. Miller, who was deceased. The defendant made many complaints about his food and treatment, and on two occasions attempted to assault his attorney. The defendant demonstrated that he has a fixed belief that all attorneys, including his own, and all officials, are in a conspiracy to deprive him of his rights. Based on these facts, counsel for defendant moved the court to declare a "doubt" as to defendant's present sanity. The attorney also called attention to the fact that defendant insists on going to trial at once, and insists that he is sane. Lambros stated that his investigation disclosed that the doctors at Atascadero who had certified defendant as presently sane had never had a psychiatric conference with the defendant, but had based their certification on statements of ward doctors and inmates.

The prosecutor objected to the court declaring a doubt as to present sanity, and stated "despite the verdict of the jury declaring him presently insane, in September of last year, I have always felt that is not a matter which a jury should pass on." He then charged that in his opinion defendant was simulating insanity and requested permission to produce evidence on the issue. A recess was then taken. After recess the defendant was brought back into the courtroom. He again stated that he had been told that he was to see Dr. Jacobs and demanded that the doctor be produced. The record then shows "The defendant evidences a display of

violence, and is subdued by certain deputy sheriffs." During this period the defendant became extremely profane and violent. Attorney Lambros then again moved that the court declare a "doubt" as to defendant's present sanity, and stated that in addition to the visits already described, he had last visited defendant at Atascadero on August 10, 1957, with the father of defendant, and that he could get nothing out of defendant but swearing and castigation of all concerned on the ground that they were conspiring to deprive him of his rights. On August 23, 1957, Lambros stated that he had visited defendant at the county jail, but could get nothing out of him except a demand to see Doctors Jacobs and Miller. Defendant again swore at Lambros and accused him of conspiring against him. Lambros reported that on that occasion defendant was taken forcibly back to the tank by four deputies. On the 25th of August, Lambros again attempted to interview the defendant but the defendant did not recognize him.

Lambros also called attention to the fact that defendant is suffering from epilepsy, is subject to epileptic seizures daily, and suffers from hallucinations and lapses of memory and violence. Lambros stated that he had been unable to consult with his client and to prepare his defense, and again requested that a "doubt" as to his present sanity be declared.

The prosecutor again objected, stating that from his investigation he believed defendant was trying to stall his trial, and asked for a continuance of the hearing.

At this point Attorney Lambros asked that the record show that all during the time that he was arguing the motion the defendant "has been on his back on the floor to the right of the bench in the courtroom. He is presently restrained by handcuffs, a body restraint, leg chain. Three deputies are presently and have been holding him down." The court directed that the record so show, and further stated that the restraint was exercised with the approval of the court.

The court then stated that it had the report from Atascadero stating that defendant was presently not insane and that the "court feels that that is more persuasive than any outward manifestation as indicated by the conduct of the defendant before the court, from which the court cannot conclude at this time that it entertains a doubt as to the present sanity." No reference was made by the court to the testimony of Attorney Lambros. The court went on to state, however, that it would appoint two psychiatrists to examine the defendant, naming them, and that the appointment was being made

pursuant to section 1871 of the Code of Civil Procedure.[2] Why this was done if the trial judge had no doubt on the issue does not appear.

The hearing was not resumed until June 16, 1958. The public defender now represented the defendant. This attorney immediately moved that the court declare a "doubt" of present sanity under section 1368 of the Penal Code. The court then proceeded to take evidence on the issue as to whether it entertained a doubt as to the present sanity of the defendant. The defendant requested permission to make a statement. Permission being granted, defendant stated at some length that he was sane and never had been insane; that he did not commit the murders involved; that a plea of insanity implied guilt; that he wished to withdraw his plea of insanity which had been entered against his will; and that he wished to waive a jury trial. This statement was substantially similar to the one made by the defendant on his prior trial when the trial court erroneously had permitted the defendant to withdraw his plea of not guilty by reason of insanity. (*People* v. *Merkouris*, 46 Cal.2d 540, 550-552 [297 P.2d 999].) The defendant then engaged in a long tirade against his present counsel, charging him with fraud and with conniving with the prosecution. The court refused to permit the withdrawal of the insanity plea.

The court then proceeded to take evidence on the issue as to whether it had a doubt as to defendant's present sanity. Evidence was introduced at great length, just as if the issue of present sanity was then before the court. Eight doctors and psychiatrists were called, seven of whom testified on the issue of sanity.

Evidence was introduced that defendant was suffering from epilepsy; that prior to 1954 the Veterans Bureau had granted him a 100 per cent disability for this disease, and that he was subject to frequent grand and petit mal seizures, and was taking medication for this disability.

Dr. Frederick Hacker and Dr. J. M. Neilsen, both on the court panel of psychiatrists and both experienced in their

[2]Section 1871 of the Code of Civil Procedure provides, in part, that "Whenever it shall be made to appear to any court or judge thereof, either before or during the trial of any action or proceeding, civil, criminal . . . that expert evidence is, or will be required by the court . . . such court or judge may, on motion of any party, or on motion of such court or judge, appoint one or more experts to investigate and testify at the trial of. such action or proceeding relative to the matter or matters as to which such expert evidence is, or will be required . . ."

field, gave it as their unequivocal opinion that defendant was presently medically and legally insane, and unable to cooperate with his counsel. One other fully qualified psychiatrist, Dr. Vernon John Miller, also on the court panel of psychiatrists, and who had examined defendant many times, had testified that in 1955 defendant was medically and legally insane and incapable of cooperating with his attorney. He opined that in 1956 the defendant's condition had deteriorated. As of June, 1958, he believed that defendant was still legally and medically insane, but in spite of that fact could cooperate with his counsel, but might break down under the stress of a trial.

Four qualified psychiatrists opined that defendant was presently sane. Several of these stated that they believed defendant was simulating insanity. One of the four admitted that defendant suffers from a progressive brain disease and that such disease is of long standing and affects defendant's behavior, but nevertheless he believed defendant to be sane.

Another psychiatrist produced by the prosecution was not only of the opinion that defendant was presently sane and was simulating insanity, but that he was also simulating epilepsy, even though all of the medical records and other evidence on this issue were to the contrary.

Mr. Lambros, former attorney for defendant, repeated his former statement about his relations with defendant and about his inability to secure any cooperation. He pointed out that in 1956, during the jury trial resulting in a verdict that defendant was then presently insane, defendant had had a fight with the prosecutor, and, after a gag proved ineffectual to quiet him, a booth had to be placed in the courtroom and defendant forcibly placed therein and chained to an iron chair during the hearing.

The attitude of the trial court during this lengthy hearing as to how it should weigh this evidence, is indicated by certain statements made by it. After three of the doctors had testified, the defense counsel called attention to the fact that the hearing was simply to determine if there was a "doubt" in the court's mind as to whether defendant was presently sane; that it appeared that the hearing was proceeding as if the issue were defendant's sanity; that that issue was being tried without affording the defendant a jury trial on this issue, to which he was entitled; that in view of the testimony already produced the defense had produced sufficient evidence to show

there was a "doubt" of defendant's present sanity. He moved that the court declare that "doubt" and not compel the defense to try the issue as if sanity or insanity were the point to be then decided. The court stated: "The burden of proof is upon you to show to the Court's satisfaction whether the defendant is presently insane, ..."

Defense counsel responded that the issue was not whether defendant was presently insane, but whether there was enough evidence to create a "doubt." The court apparently agreed with this analysis. After defense counsel again importuned the court to declare such "doubt" the court stated that "this proceeding is initiated at your suggestion. Consequently, the burden is upon you to submit whatever proof you may have so that the Court can determine whether or not it has any doubt as to the present sanity of the defendant, sufficient to require a trial upon that issue."

After some discussion of the quantum of proof required, the court stated that it could not evaluate the evidence produced until the district attorney had produced the evidence he desired, and further evidence was produced.

After all the evidence on the issue had been presented the trial court directed the defense counsel to make an opening argument because the "burden" is "upon you."

After argument, the court purported to review the evidence on the issue, and at the conclusion of that review stated that it had reviewed the doctors' reports and from those reports "it seems that the evidence preponderates in favor of the present sanity within the Statute as we understand it, that is the Court cannot feel justified in entertaining a doubt as to the defendant's present sanity within the meaning of the Statute.

"The Court feels from the information before it and from the observation of the defendant, and as one of the doctors points out, this defendant is anxious to go to trial and having his case presented, the Court does not entertain a doubt within the meaning of the Statute that the defendant is presently insane and therefore the Court finds this case is now ready for trial."

This record demonstrates, in my opinion, that, as a matter of law, a "doubt" existed as to defendant's present sanity. On the prior trial of this very case this court held that on evidence much slimmer than that here involved that a "doubt" existed as a matter of law, and that failure of the trial court to declare such "doubt" constituted reversible error. (*People v. Merkouris*, 46 Cal.2d 540 [297 P.2d 999].) At page 552

this court stated: "Prior to the commencement of the trial itself, the court had before it an affidavit of a qualified psychiatrist in which it was averred, without any equivocation, that the defendant was medically and legally insane at the time of trial, as well as at the time the alleged act was committed." After quoting section 1368 of the Penal Code, and after referring to certain comments of the trial court, this court continued as follows (p. 553) : "It appears as a matter of law that there was, at that time, a doubt in the mind of the court as to defendant's sanity. (*People* v. *Ah Ying,* 42 Cal. 18, 21.) We said in *People* v. *Aparicio,* 38 Cal.2d 565, 568 [241 P.2d 221], that 'when a doubt of the defendant's sanity . . . appears on the face of the record as a matter of law, an abuse of discretion is shown and the failure to order a determination of the question of sanity results in a miscarriage of justice and a reversal is required. (*People* v. *Vester,* 135 Cal.App. 223 [26 P.2d 685] ; *People* v. *West, supra,* 25 Cal.App. 369 [143 P. 793].) '

"Taking the evidence concerning defendant's sanity as reflected in the record, we see that three court-appointed psychiatrists considered him sane at the time of trial as well as sane at the time the crime was committed; we see that one independent psychiatrist considered him both legally and medically insane at both times. This conflict in the medical evidence was sufficient to make the question one of fact which should have been tried. . . .

"It is our conclusion that the trial court abused its discretion in not trying the issue of defendant's sanity at the commencement of the trial and in permitting the defendant, over the implied objection of his counsel, to withdraw his plea of not guilty by reason of insanity."

If a "doubt" existed as a matter of law because of the facts and circumstances as they existed in February of 1955 prior to the first trial, certainly a "doubt" existed as a matter of law in August of 1957 and June of 1958. The following factors, considered collectively, demonstrate this to a certainty:

1. The fact that defendant was an epileptic subject to almost daily seizures ;

2. The fact that a jury had determined that defendant was insane in September of 1956 ;

3. The conduct of defendant in court during these proceedings, and the fact that he had to be forcibly restrained;

4. The testimony of Attorney Lambros that he had been

unable to communicate with his client or to secure his co-operation in preparing the defense;

5. The testimony of three qualified psychiatrists that, in their opinion, defendant was then legally and medically insane, two being of the opinion that such insanity prevented the defendant from cooperating with his counsel;

6. The fact that this court, on much slimmer evidence than has here been produced, has ruled, on the prior appeal, that such evidence created a doubt as a matter of law.

In prior cases it has been held that the presence of several of these factors was sufficient to create a "doubt" as a matter of law. (*People* v. *Jackson*, 105 Cal.App.2d 811 [234 P.2d 261]; *People* v. *Vester*, 135 Cal.App. 223 [26 P.2d 685]; *People* v. *West*, 25 Cal.App. 369 [143 P. 793]; and of course *People* v. *Merkouris*, 46 Cal.2d 540 [297 P.2d 999].) In none of these cases were all of the factors here involved present.

It is true that four qualified psychiatrists opined that defendant was presently sane. But this testimony merely created a conflict on the issue of present sanity. Had the issue before the court been whether defendant was or was not presently sane, the testimony of these four psychiatrists would have supported a finding that defendant was then sane. But defendant was entitled, upon demand, to a jury trial on that issue. (Pen. Code, § 1368.) The issue of present sanity was not then before the court. The only issue then involved was whether a "doubt" existed as to present sanity. Reasonable minds cannot differ on the answer to that question. Under all of the facts then existing such "doubt" existed as a matter of law.

The error of the trial court was further aggravated by the vacillating standards adopted by it in passing on the motion. After defense counsel had produced evidence aimed at creating a "doubt" in the court's mind, the court stated: "The burden of proof is upon you to show to the Court's satisfaction whether the defendant is presently insane." That, of course, was a misstatement of the issue then before the court. That issue was not present insanity at all. The issue was whether there existed a "doubt" as to present sanity.

After this error was called to the attention of the trial court, and after the court properly stated that the burden was on defendant to raise a doubt in its mind, the court expressed the thought that there could not exist a legal doubt if the evidence preponderated in favor of sanity. This confusion persisted until the very close of the hearing. After argument by counsel, the court, in making its ruling, stated:

". . . from the doctors' reports, it seems that the evidence preponderates in favor of the present sanity within the Statute as we understand it, that is the Court cannot feel justified in entertaining a doubt as to the defendant's present sanity within the meaning of the Statute."

This was error of a most serious nature. Certainly section 1368 does not require that before a "doubt" exists the evidence must "preponderate" in favor of present insanity.

For these reasons, in my opinion, the trial court committed error in failing to declare a doubt as to defendant's present sanity. That this error was prejudicial is obvious. Under section 1368 of the Penal Code the defendant was entitled, upon demand, to a jury trial on this issue. He was deprived of this fundamental right. This constitutes reversible error.

This error, alone, requires a reversal. In addition, on the trial on the merits, serious and prejudicial errors occurred. It is true, as stated in the majority opinion, that the evidence on the merits is sufficient to sustain the judgments. But that evidence was not overwhelming. It was entirely circumstantial. Defendant's defense was an alibi which he supported by substantial evidence. The evidence, as summarized in the opinion on the prior appeal, disclosed that the case on its merits was a very close one. That being so, any substantial error may well have tipped the balance, and must be considered to have been prejudicial.

The trial court, in my opinion, made several serious and prejudicial rulings on the admission of evidence.

In the first place, over proper objection, the trial court erred in admitting hearsay statements that defendant, some four to six years before the killings, had threatened the decedents. Those statements were testified to by Mrs. Dulce Fairly, mother of one of the decedents, by C. F. Fairly and by Clifford Bonk, a police officer and former neighbor of one of decedents. Mr. and Mrs. Fairly testified that in August of 1948 (the killings occurred on September 20, 1954) the decedents came to them and stated, in substance, that they wanted to come and live with them for a while because their lives had been threatened by Mr. Merkouris. Bonk was permitted to testify, over objection, that in 1949 or 1950 he, the witness, saw Robert Forbes, one of the decedents, at the City Hall; that Forbes told the witness that he was going to get a gun permit because his wife's ex-husband, the defendant, was bothering them; that Forbes stated to the witness that he thought the situation was desperate enough to warrant carrying a gun; that he, Forbes, was afraid of the "guy."

The objections to this evidence were that it was too remote, was immaterial, and was hearsay. The court, while properly ruling that the evidence was not to be received to prove the truth of the statements, ruled that they were admissible to show the declaration of an intention on the part of the deceased to do an act in the future, that is, to come and live with the Fairlys, and to show the state of mind of the deceased at the time of the statements.

Of course, in some cases, evidence of the declarant's statement of intention is material, relevant and admissible. In *People* v. *Alcalde,* 24 Cal.2d 177 [148 P.2d 627], it was material that the deceased intended to go out with the defendant the night of the murder. In *People* v. *Weatherford,* 27 Cal.2d 401 [164 P.2d 753], it was material that the deceased intended to leave the defendant's premises close to the time of the killing. But in the instant case it was not material that six years before the killings decedents intended to move in with the Fairlys, or that four years before the killings one of decedents sought a gun permit. Nor was the state of mind of the deceased declarant at those times material to any issue before the court. The only possible materiality of the evidence was to show that six and four years before the killings the decedents were threatened by defendant. While threats made by defendant are, of course, material, they must be testified to by the person who heard them, not by someone who was told by someone else that they had been made. While the trial court correctly instructed that the evidence was not introduced to prove the truth of the statements, such instruction was obviously ineffectual. If the state of mind of the decedent was admissible, it was only so because from that state of mind, that is fear of defendant, it could be inferred that the statements about threats were true. If this were not the purpose and effect of the evidence, why was it introduced? The fact that defendant threatened to kill decedents some years before the killings would be material and relevant if testified to by one who had heard the threats, but when it is offered not to prove the threats but the state of mind of decedent, its only materiality would be to connect the defendant with the crime. The state of mind of the deceased is immaterial except to show that defendant threatened to kill him. Thus, the limitation placed on the evidence by the trial court was obviously ineffectual. The improper admission of this testimony on such a vital issue, in a circumstantial evidence case, was prejudicial.

The trial court also, in my opinion, committed error, and prejudicial error, in permitting, over objection, Postal Inspector Wood to testify that, included in a prior indictment against defendant (which indictment was introduced into evidence), there was included not only a charge of sending obscene letters through the mails, but also the charge of sending threats through the mails. This was not a subject of expert testimony. The issue as to whether or not defendant had made prior threats against decedents was a vital one. The indictment speaks for itself. It contains no language about threats. It relates only to obscenity. The evidence should not have been admitted. The error, apparently conceded in the majority opinion, was obviously prejudicial.

The last error necessary to mention occurred during the penalty hearing. At that hearing, by stipulation, it was conceded that on September 13, 1956, a jury had found defendant to be then insane. It was further stipulated that on August 13, 1957, the hospital staff at Atascadero certified defendant to be, in their opinion, then sane. Then at the penalty hearing, the prosecution called Doctors Crahan and McNeil. Over the vigorous objections of the defense that such was res judicata, the doctors were permitted to testify that in August and September of 1956 defendant, in their opinion, was not insane, but was malingering insanity and had misled the jury. This issue had been decided by a jury verdict. The judgment on that verdict was final. The prosecution had no legal right to attack that final judgment. That judgment determined that in September of 1956 defendant was insane. The cases cited in the majority opinion on this point merely hold that such a determination is not conclusive as to mental condition at some future date. It is correct to state that insanity once proven, does not conclusively prove the person is insane at a later date—the judgment of insanity merely creates a rebuttable presumption that the insanity continues. But that does not mean that a witness may attack a final judgment and testify that such judgment was erroneous. The prejudicial nature of this testimony is obvious.

For the foregoing reasons I would reverse the judgment and the order denying the motion for a new trial.

Gibson, C. J., and Traynor, J., concurred.

Appellant's petition for a rehearing was denied October 15, 1959. Gibson, C. J., Traynor, J., and Peters, J., were of the opinion that the petition should be granted.