**Albert Russell LAUDERMILK, Petitioner-Appellant,**

v.

**CALIFORNIA DEPARTMENT OF COR-RECTIONS and W. T. Stone, Superintendent, Respondents-Appellees.**

No. 25173.

United States Court of Appeals, Ninth Circuit.

March 16, 1971.

Ely, Circuit Judge, dissented and filed opinion.

Albert Russell Laudermilk, in pro. per.

Evelle J. Younger, Atty. Gen., William E. James, Asst. Atty. Gen., Mark L. Christiansen, Deputy Atty. Gen., San Diego, Cal., for appellees.

Before DUNIWAY, ELY and WRIGHT, Circuit Judges.

PER CURIAM:

This appeal is the latest in a long series of attempts by petitioner Laudermilk to secure his release from the custody of the California authorities where he is now serving a life sentence following his plea of guilty to a charge of murder in the first degree. The district court has denied his petition for writ of habeas corpus and we affirm.

A detailed recitation of the factual background here is unnecessary. Because of our disposition, it is sufficient to note that Laudermilk's sole contention here is that his plea of guilty is invalid under Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), since there was no pretrial hearing as to his competency to stand trial or enter a plea of guilty.

This question has been given substantial consideration by other courts before reaching this court. Laudermilk's appeal was first heard by a California District Court of Appeal which, by a 3–1 vote, affirmed his conviction in January, 1967, in an unreported decision.

This case was then affirmed by the Supreme Court of California, sitting en banc, with Justice Peters dissenting. People v. Laudermilk, 67 Cal.2d 272, 61 Cal.Rptr. 644, 431 P.2d 228 (1967). The United States Supreme Court denied certiorari. Laudermilk v. California, 393 U.S. 861, 89 S.Ct. 139, 21 L.Ed.2d 128 (1968).

This action followed when Laudermilk filed his petition for habeas corpus in the district court. After a detailed review of the state court record, the district court denied the petition. Neither the petition nor his brief on appeal suggests that there is any further evidence which might lead to a conclusion other than that reached by the state trial court six years ago.

Like the four other courts before us, we have carefully reviewed the record from the state trial court and conclude that the district court's denial of habeas corpus should be affirmed for the reasons set forth in the opinion of the Supreme Court of California. People v. Laudermilk, *supra*.

There is nothing in our decision of Rhay v. White, 385 F.2d 883 (9th Cir. 1967) which dictates a contrary result. *See also* Schoeller v. Dunbar, 423 F.2d 1183 (9th Cir. 1970.)

Affirmed.

ELY, Circuit Judge (dissenting):

I respectfully dissent. The state court judge accepted Laudermilk's plea of guilty to a charge of first degree murder knowing that Laudermilk had recently been confined in different hospitals for the mentally ill and having been advised that Laudermilk was then uncooperative with his own attorney. One of the medical reports before the judge, that of a Dr. Hoffman, recited the doctor's opinion to the effect that Laudermilk was afflicted with a severely paranoid personality and should be given psychiatric treatment. Despite all this information, the trial judge accepted Laudermilk's plea and ordered him confined to prison for life without conducting a sanity hearing to determine whether Laudermilk was mentally competent to enter the plea.

I cannot reconcile the result reached by my Brothers with Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836 (1966), and my views thoroughly coincide with those of Mr. Justice Peters of the California Supreme Court, set forth in his dissenting opinion in People v. Laudermilk, 67 Cal.2d 272, 288–296, 61 Cal.Rptr. 644, 655–660, 431 P.2d 228, 239–244, (1967), cert. denied, sub. nom. Laudermilk v. California, 393 U.S. 861, 89 S.Ct. 139 (1968). At the point when the trial judge accepted Laudermilk's plea, the situation was such as to require that a hearing be conducted. The judge could not, I submit, undertake to resolve the competency question, then readily apparent, by simply weighing conflicting written reports.

I adopt Mr. Justice Peters' opinion as my own, and I think it so perceptive and so carefully documented as to merit republication in the Federal Reporter. It reads:

PETERS, Associate Justice.

I dissent.

The sole point of any importance involved on this appeal is whether there was presented to the trial court any substantial evidence of the insanity of appellant so as to entitle him to the hearing required by section 1368 of the Penal Code.[1] If such evidence was produced, no matter how strong the conflicting evidence may have been and no matter how weak was the evidence on behalf of appellant, provided only it was substantial, the trial judge was required to order a present sanity hearing as a matter of law.

---

1. Penal Code section 1368 provides: "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined, and the trial jury in the criminal prosecution may be discharged, or retained, according to the discretion of the court until the determination of the issue of insanity."

This was not always the California law. For many years the California courts had held that the trial court on a motion under section 1368, and on conflicting evidence, had discretion to determine whether it had a "doubt" of sanity, and if not to deny the motion. (See People v. Merkouris, 52 Cal.2d 672, 344 P.2d 1, cert. den. 361 U.S. 943, 80 S.Ct. 411, 4 L.Ed.2d 364; People v. Lindsey, 56 Cal.2d 324, 14 Cal.Rptr. 678, 363 P.2d 910.) Under the compulsion of Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836, 15 L.Ed.2d 815, this court in People v. Pennington, 66 Cal.2d 508, 58 Cal.Rptr. 374, 426 P.2d 942, revised the rule of the *Merkouris* and *Lindsey* cases, *supra,* and disapproved portions of those opinions. The majority, in the instant case, holds that there was no substantial evidence of insanity within the meaning of section 1368, and that a sanity hearing was properly denied. In so holding the majority, while purporting to recognize the fundamental changes in the law accomplished by the *Robinson* and *Pennington* cases, *supra,* give only lip service to those changes and in fact apply the now repudiated rules of *Merkouris* and *Lindsey, supra.* To say the least, the majority gravely, and in my opinion erroneously, limit the rule of the *Robinson* and *Pennington* cases, *supra.*

The proper rule, and the one adopted in the *Pennington* case, *supra,* is stated as follows (66 Cal.2d at p. 518, 58 Cal. Rptr. at p. 381, 426 P.2d at p. 949):

"*Pate v. Robinson* stands for the proposition that an accused has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense. Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence— testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary.

"When the evidence casting doubt on an accused's present sanity is less than substantial, People v. Merkouris, *supra,* 52 Cal.2d 672, 678–679, 344 P.2d 1, correctly states the rules for application of section 1368 of the Penal Code. Whether to order a present sanity hearing is for the discretion of the trial judge, and only where a doubt as to sanity may be said to appear as a matter of law or where there is an abuse of discretion may the trial judge's determination be disturbed on appeal. But, when defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing, as a matter of right under Pate v. Robinson, *supra,* 383 U.S. 375, 86 S.Ct. 836 [15 L.Ed.2d 815]. The judge then has no discretion to exercise. Insofar as People v. Merkouris, *supra,* 52 Cal.2d 672, 344 P.2d 1, and People v. Lindsey, *supra,* 56 Cal.2d 324, 14 Cal.Rptr. 678, 363 P.2d 910, suggests that the judge, because he personally has no doubt as to the accused's sanity, may deny a section 1368 hearing despite substantial evidence of present insanity, they are overruled."

In the *Pennington* case, *supra,* the evidence of insanity within the meaning of section 1368 was substantial, and the majority so admit. The evidence in Pate v. Robinson, *supra,* was not nearly so substantial, and yet the Supreme Court of the United States reversed a determination of the Illinois court that it had no doubt of sanity, and held that a hearing was required as a matter of law. We, of course, are bound by that opinion.

In *Pennington, supra,* this court summarized the evidence produced in Pate v. Robinson, *supra,* and commented on the applicable law, as follows (66 Cal.2d at p. 517, 58 Cal.Rptr. at p. 380, 426 P.2d at p. 948): "That evidence consisted of testimony by three of Robinson's close relatives and one family friend relating various acts of Robinson several years be-

fore the trial which suggested mental illness.[7] Two of the witnesses, Robinson's

"[7] Robinson had been struck in the head by a brick at age seven and thereafter, according to his mother, ' "acted a little peculiar." ' He once kicked a hole in the family bar for no apparent reason. He was sullen and frequently complained of headaches. He had been in many fights and had murdered his own infant son. He became 'noticeably erratic' when in the Army. His mother observed him on occasions with a ' "glare in his eyes" ' and once found him pacing the floor saying something was after him. She had also observed him ' "a little foamy at the mouth." ' The family friend said that when she spoke to Robinson he either stared at the floor or looked at her 'glassy-eyed.' Robinson's grandfather testified that Robinson was 'not right'—often walked abruptly away from his work and often appeared in a daze. Robinson once quarreled with his wife, and threatened to burn her clothes. He became so unruly he tried to knock down a door, and police were called. The aunt testified that Robinson acted strangely and that she had seen him ' "stary-eyed" * * *, prancing, nervous, and "just staring wild." ' Robinson also once feared someone was going to kill him.

"Records from the Illinois mental hospital where he had been confined revealed that Robinson had been drinking heavily when admitted and that he had hallucinations of voices, snakes, elephants, and other animals. (Pate v. Robinson, supra, 383 U.S. 375, 378–382, 86 S.Ct. 836, 15 L.Ed.2d 815, 818–820; People v. Robinson, supra, 22 Ill.2d 162, 164–166, 174 N.E.2d 820).

mother and aunt, stated that in their opinion he was insane at the time of trial. His grandfather and the family friend testified that they considered him to be insane at unpredictable periods of time. It was also brought out that he had spent several weeks in a mental hospital some eight years before trial. But he was recovered from his illness when discharged and about two years later was adjudged sane in a restoration proceeding. It was stipulated at Robinson's murder trial that a psychiatrist who had examined Robinson had found him sufficiently sane to stand trial. In affirming Robinson's conviction, the Supreme Court of Illinois had held that the evidence did not 'raise a *bona fide* doubt as

to * * * [Robinson's] present sanity.' (People v. Robinson, *supra,* 22 Ill. 2d at p. 167, 174 N.E.2d 820.) It noted that the defense witnesses had based their conclusions that Robinson was insane or insane at times primarily on incidents occurring years before trial. Furthermore, the court noted, the record disclosed several instances during trial where Robinson displayed his ability to assist in his defense by making lucid and cogent legal arguments to the trial judge. (Id. at p. 168, 174 N.E.2d 820.)

"The United States Supreme Court held that neither the stipulation that a psychiatrist had found Robinson sufficiently sane to stand trial nor Robinson's lucid comments during the trial offered a 'justification for ignoring the uncontradicted testimony of Robinson's history of pronounced irrational behavior.' (Pate v. Robinson, *supra,* 383 U.S. at pp. 385–386, 86 S.Ct. at p. 842, [15 L.Ed.2d at p. 822].) 'We believe,' states the court's holding, 'that the evidence introduced on Robinson's behalf entitled him to a hearing on this issue. The court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial.' (Id. at p. 385, 86 S.Ct. at p. 842, [15 L.Ed.2d at p. 822.])"

Thus the evidence was conflicting in *Robinson, supra,* and the evidence of incompetence to stand trial was remote and not very strong. Yet it was held to be sufficient as a matter of law to entitle Robinson to a present sanity hearing.

In the instant case the evidence on the issue is much more substantial than it was in *Robinson, supra.* The majority opinion summarizes part of that evidence at some length. That very summary demonstrates more eloquently than any argument that I can make that substantial evidence of insanity within the ambit of section 1368 existed. Certainly that evidence demonstrated that Laundermilk had an uncontradicted "history of pronounced irrational behavior" more than did Robinson, and that is the test laid down in that case.

In *Robinson, supra,* the defendant had spent "several weeks" in a mental hospital eight years before his trial and was adjudged sane two years later. In the instant case appellant had been in a series of mental hospitals but a year or two before trial. In *Robinson, supra,* there was no expert testimony on behalf of the accused; here there was such testimony. Here the attorney told the court of his inability to communicate with the accused.

A reference to some of this testimony will demonstrate the substantial nature of the evidence of incompetency. The defendant was permitted to make a statement. He stated:

"When I was in Colorado I was accused of something I didn't do. The Court was throwed out. After that I tried to commit suicide. My wife stopped me from doing so. Of course, I blacked clear out. Don't know what all happened. When I got back to what I knew was going on, I got in the car, tried to leave by myself and she followed me. She went out and jumped in the car too. Anyway, she had the kids to call the cops and they locked me up. She sent me to the hospital and they said I was nuts or something, I don't know. Anyhow, when I got out of it they told me they couldn't do anything for me at this time. So three days later I went over in the VA hospital and I stayed over there, I don't know, three weeks, a month or so, and they turned me loose under the same condition, and Dr. Katz told me to go out to the State hospital and apply there.

"So I went out, made application, then they called the other two doctors and they told me there was nothing they could do for me and they couldn't put me on outpatient deal unless I went in the hospital, and after talking to the two other doctors there was nothing they could do. So they recommended me to go out to an outpatient deal out to the Jefferson County Hospital or Jefferson County Mental Health. I went out there and as things was going it didn't work out, so I tried running, I tried drinking, and nothing ever worked out. Meanwhile, the Court took my kids away from me because I was a nut and I couldn't write, call them, see them or anything else, put them on welfare. I had a job making good money, yet, I couldn't even help them at all. So we left there and came out here to try to get away from that Court. Of course, my wife was afraid the Court out here would find out about it and take them away from her permanently because the Judge told her she would have to get a divorce, restraining order on me and stay from me and if they ever caught us together they would take them away from her permanent, and we had that trouble out here. There is nothing we can do about it. Who is wrong? These two doctors here or the doctors back there? Somebody is some place."

"I met approximately five Boards, I imagine, I don't know, 15, 20 doctors on the Board. Society is going to condemn you: society refused to help you. Now they are going to hang me for it. Now, somebody is wrong some place."

Then there is the report of Dr. Hoffman. He found the accused depressed and observed him crying at times during the examination. The accused expressed the wish to die if his mental illness could not be cured. "His entire history was given in a rather disconnected fashion. * * * Much of his speech has a paranoid flavor." Hoffman found defendant of average intelligence, suffering no impairment in orientation. Hoffman observed no "frank delusions" and defendant admitted no hallucinations to him. The report states: "It did not appear that this defendent [*sic*] was truly aware of the seriousness of his disorder, and he had no insight into his unrealistic attitudes. In my opinion, the defendent [*sic*] is able to ascertain right from wrong, and would be able to assist in his defense. He cannot be classified as overtly psychotic, but does appear, however, to have a mental illness which is of long standing, and is of sufficient severity to have resulted in the committing of an act of homicide and attempted

suicide. According to the records, this defect in the patient's reasoning and his resultant actions have been commented upon on numerous occasions in the past, and appeared to be no less present at this time.

"PSYCHIATRIC IMPRESSION:

"(1) Paranoid personality, severe. (2) Depressive reaction.

"RECOMMENDATIONS:

"In my opinion, this defendent [sic] should be placed in an adequate psychiatric facility under the jurisdiction of the penal system and afforded whatever treatment is available. It is my opinion that if this is not done, he will in the future, with comparatively little provication [sic], constitute a danger to others and will probably at the first opportunity do away with himself."

The probation report, completed December 7, also bears on defendant's mental condition. It quotes another psychiatrist's report concerning defendant, one made in September 1964 by Dr. John A. Hunter at the request of the district attorney. Dr. Hunter said he did not find defendant overtly paranoid, " 'But he could probably be regarded as a paranoid type of personality, if only because of his many expressions of pathological hostility in the past. However, it is characteristic of a paranoic [sic] to be able to put up a very normal facade while he harbors many delusional ideas.' "

The probation officer's report, among other things, stated:

"This defendant reflects serious, deep-rooted emotional problems, and we agree that he reflects many of the facets of the paranoid personality."

When counsel for the accused made the motion for a hearing under section 1368 he stated that he was making the motion because the accused appeared to him to be too mentally deranged to assist in his defense; that for the previous one and one-half weeks the accused would only discuss three things: his desire to die, the whereabouts of his children, and the inability of the psychiatrists in Colorado to help him.

The prosecuting attorney was so impressed with the defendant's mental condition that he argued at the penalty hearing that death should not be imposed because of such mental condition.

It seems clear to me that when this record is read as a whole it raises sufficient doubt of defendant's sanity that the special hearing provided by section 1368 was required. It would seem to me that Dr. Hoffman's medical evidence coupled with defense counsel's report, defendant's own statement, and the other reports, constitute the required substantial evidence of present insanity as defined for section 1368 purposes. They certainly show a "history of pronounced irrational behavior" and that is all that is required under *Robinson, supra.*

The statement of counsel, although not controlling, is entitled to some weight. While this statement that the defendant appeared unable to cooperate, for reasons set forth by the majority, does not by itself compel a section 1368 hearing, it cannot be completely ignored and is entitled to some significance. Otherwise, a conscientious lawyer faced with a client who is unable or unwilling to disclose possible defenses and otherwise to cooperate will be inclined to do what apparently defense counsel did in the instant case—ignore possible defenses, plead his client guilty and throw himself on the mercy of the court. The state, of course, has no legitimate interest in securing the conviction of a defendant who may have a defense but who because of his mental condition is unable to defend himself. Therefore, when a competent, responsible attorney makes representations to the court that his client is unable to cooperate, it should take little more to constitute "substantial evidence."

Far more than a "little more" such evidence is found in Dr. Hoffman's report. It is true that Dr. Hoffman does not directly state that defendant is unable to cooperate in his defense, but such evidence is not required. There

was no such evidence in Pate v. Robinson, *supra*. There the sanity hearing was required merely because of an uncontradicted "history of pronounced irrational behavior."

The majority opinion seeks to disparage the Hoffman report by seizing upon the phrase appearing in the middle of it that defendant "would be able to assist in his defense." This is characterized by the majority as the "crux of the report." That is a misnomer. A mere reading of the portions of the report set forth in the majority opinion demonstrates that this is so. With far more justification the following findings and opinions of Dr. Hoffman can be classified as the "crux of his report."

He gave it as his impression that defendant had a "(1) Paranoid personality, severe. (2) Depressive reaction." That fundamental conclusion was fortified by his findings and observations that he found defendant depressed and observed him "crying occasionally during the interview"; that he wished to die if his mental illness could not be cured; that "much of his speech has a paranoid flavor"; that defendant "does appear, however, to have a mental illness which is of long standing, and is of sufficient severity to have resulted in the committing of an act of homicide and attempted suicide"; and that the defects in defendant's memory and actions "appeared to be no less present at this time."

The report concluded with the recommendation that defendant be placed in a mental hospital for treatment because without such treatment he would be a danger to others and "will probably at the first opportunity do away with himself."

This recommendation and the entire diagnosis strongly suggest that the reason defendant was not cooperating with his counsel was because his mental illness—paranoia with depressive reaction—rendered him incapable of doing so, incapable of taking any steps that would tend to save his own life. Hoffman stated that defendant's severe and long-standing mental illness had caused him to kill his former wife and to attempt suicide. Hoffman further stated that this illness would cause defendant to take his own life at the first opportunity with comparatively little provocation. The criminal proceeding on the murder charge was such an opportunity. In my view, Hoffman's diagnosis coupled with defendant's history of mental illness and defense counsel's report that defendant was not cooperating but was brooding about death constitute substantial evidence that defendant was incapable, because of mental illness, of assisting in a course of conduct—his own defense—that would spare his life. Instead, he was compulsively driven to "do away with himself," as Hoffman phrased it.

To hold that the phrase that defendant was able to cooperate is the "crux" of Dr. Hoffman's report is to disregard the major portion of that report and to distort its meaning and impact. The majority treat the phrase as if it were the solemn final conclusion of Dr. Hoffman. It is no such thing. It is simply an incidental phrase that appears in the middle of the report. It is contradicted by what is said before the phrase and by what appears after it. At the very most it creates a conflict with the major portion of the report. Under the rule announced in *Pennington* and *Robinson, supra,* the trial court was required to disregard that conflict. The mere fact that the conflict appears within a single report and is not between two separate reports, makes no legal difference. (See 30 Am.Jur.2d, § 1082, p. 230.) The holding to the contrary in the majority opinion is simply wrong.

I conclude that when the trial court received, properly, as held by the majority, the Hoffman report, and the other evidence referred to, it had substantial evidence prior to judgment of incompetency of the accused to cooperate in his own defense, and under Pate v. Robinson, *supra,* as explained in People v.

Pennington, *supra*, was compelled to grant a present sanity hearing.

For these reasons I would reverse the judgment.

I would reverse.